[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-15470

_____

D.C. Docket No. 3:16-cr-00093-TJC-JRK-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

CORRINE BROWN,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 9, 2020)

Before WILLIAM PRYOR and ROSENBAUM, Circuit Judges, and CONWAY,*
District Judge.

---

* Honorable Anne C. Conway, District Judge for the United States District Court for the
Middle District of Florida, sitting by designation.

ROSENBAUM, Circuit Judge:

If the right to a jury trial means anything, it means a right to a verdict based on the evidence. Indeed, the entirety of our procedural mechanisms is geared to achieve this result: we have trials so we can ensure all jurors consider the same universe of evidence; we have an entire body of rules—the Federal Rules of Evidence—devoted to controlling the information on which jurors can rely in reaching their decision; and we expressly instruct the jurors that they must determine their verdict based on the evidence. Then, if a defendant loses at trial, on appeal, we review the record to be certain that sufficient evidence supports the verdict.

We do these things to try to ensure that only those proven guilty based on admissible evidence will be convicted and to try to prevent convictions that arise from prejudice or even ostensibly noble reasons—such as a juror's belief that God has told him to convict, irrespective of the evidence. The consistent application of these practices underpins the public's faith in the jury system and delivers due process of law, an ideal in which our system of justice is grounded.

So we must steadfastly insist that a deliberating juror who is incapable of reaching a verdict based on the evidence be dismissed, regardless of whether that juror intends to convict or acquit a defendant. If we do not, we guarantee that, under

2

at least some circumstances, a juror who is unable to arrive at a verdict rooted in the evidence will nonetheless be allowed to convict a defendant. That is unacceptable.

Here, the district court became aware that during deliberations, Juror 13 in Defendant-Appellant Corrine Brown's trial made remarks suggesting he might not base his verdict on the evidence adduced at trial. Specifically, Juror 13 informed the other jurors at the outset of deliberations that "[t]he Holy Spirit told [him]" that Brown was not guilty on all counts.

The district court questioned Juror 13 for a while, in the presence of the parties, to ascertain whether Juror 13 meant that he had prayed to the Holy Spirit for guidance and wisdom in reaching a verdict based on the evidence—which would not run afoul of the court's instructions to return a verdict based on the evidence—or whether he meant instead that he believed the Holy Spirit had "told" him to return a certain verdict irrespective of what the evidence showed—which would violate the court's instructions. Based on Juror 13's responses and demeanor, the district court concluded that Juror 13 was not capable of rendering a verdict rooted in the evidence presented at trial but that, despite his best intentions, Juror 13 would instead arrive at a verdict based on his perceived divine revelation, uninformed by the actual evidence. For this reason, the district court dismissed Juror 13 from the jury.

We find no clear error in the district court's factual findings. And for that reason, the district court certainly did not abuse its discretion in dismissing Juror 13

3

from the jury. To hold otherwise would undermine our system of justice by allowing jurors to return verdicts based not on the evidence or law, but instead on a juror's perceived divine revelation, irrespective of the evidence. Though here, the juror's perceived divine revelation might have worked in the criminal defendant's favor had the district court not learned of it mid-deliberations, a contrary holding would allow criminal defendants to be *convicted* based on a divine revelation divorced from the evidence, rather than the evidence presented at trial—a troubling result, to say the least. And regardless of whether it works in favor of or against the defendant, a rule that would allow a juror to base his verdict on something other than the evidence would be antithetical to the rule of law and is contradicted by decades of precedent.

Brown also raises a challenge to the forfeiture order the district court entered. We find no error there, either. We therefore affirm Brown's convictions.

# I.

## A.

A federal grand jury issued a 24-count indictment charging Brown with one count of conspiracy to commit mail and wire fraud (18 U.S.C. § 1349), sixteen counts of mail and wire fraud (18 U.S.C. §§ 1341, 1342, 1343), one count of theft of government funds (18 U.S.C. §§ 641, 642), two counts of engaging in a scheme to conceal material facts (18 U.S.C. § 1001(a)(1)), one count of engaging in a corrupt

4

endeavor to obstruct the administration of the Internal Revenue laws (26 U.S.C. § 7212(a)), and three counts of filing a false tax return (26 U.S.C. § 7206(1)).

The charges related to One Door for Education—Amy Anderson Scholarship Fund ("One Door for Education"), an organization that purported to be a charity that raised funds for, "among other things, scholarship assistance for disadvantaged students and the purchase of computers to be donated to schools." According to the indictment, Brown and her alleged co-conspirators "used Brown's official position as a Member of Congress to solicit contributions to One Door for Education and to induce individuals and entities to make donations" to that organization for the stated charitable purposes.

But upon receipt of the contributions, the indictment alleged, Brown and her co-conspirators distributed a total of only $1,200 for scholarships from the more than $800,000 collected for that stated purpose. The indictment further asserted that Brown and her co-conspirators used the "vast majority" of the remaining monies "for their own personal and professional benefit." In particular, the indictment charged that they used the funds to pay for "a variety of personal expenses" such as "luxury vacations," and "to pay for events hosted by Brown or held in [her] honor," including spending the monies for the use of luxury boxes at sporting and concert events.

5

Brown proceeded to trial on the charges. During jury selection, all prospective jurors affirmed that they had no "political, religious, or moral beliefs that would preclude [them] from serving as a fair, impartial juror" in the case and that they had no "religious or moral beliefs" that would preclude them from "sitting in judgment of another person." Then the selected jurors swore to "render a true verdict, according to the law, evidence, and instructions of this court, so help [them] God."

The court elaborated on that promise, explaining that the jurors' job was to "decide this case based solely on the evidence [they] hear[d] in this courtroom." The court then repeated its instruction twice more: "If you didn't get it in this courtroom, you shouldn't have it. If you didn't get it in this courtroom, you shouldn't have it." In fact, the court further emphasized that "our whole system depends on the fact that the case is decided in this courtroom on the evidence in this courtroom and nothing else," and that "every single one of [the jurors] has that responsibility to make sure that that's what happens."

During the trial, the parties presented 371 exhibits and testimony from 41 witnesses. On May 8, 2017, after the eight-day trial, the court instructed the jury on the law. It told the jury that its "decision must be based only on the evidence presented during the trial" and that it "must not be influenced in any way either by sympathy for or prejudice against the defendant or the government." And, the court said, the jury "must follow the law" as the court explained it, "even if [the jurors]

6

d[id] not agree with the law," and "must follow all of [the court's] instructions as a whole." The court explained that the government's burden to prove the defendant's guilt beyond a reasonable doubt required "real doubt, based on [the jury's] reason and common sense after [ ] carefully and impartially consider[ing] all the evidence in the case." Then it emphasized that the jury "must consider only the evidence that [the court] ha[d] admitted in the case."

After instructing the jury on the elements of the charged offenses, the court told the jurors that they were the "judges of the facts" and that their "only interest [was] to seek the truth from the evidence in the case." Before the jury started deliberations, the court identified the alternates and ordered them to stay in the courthouse and to continue to not discuss the case. The jury then began deliberating.

## B.

It wasn't too long before trouble began to brew. In the evening of May 9, Juror 8 (who was not the foreperson) called the courtroom deputy and reported that she and other jurors had "concerns" about Juror 13. In particular, Juror 8 conveyed that from the outset of deliberations, Juror 13 had been speaking about "Higher Beings" in connection with Brown's name. The courtroom deputy immediately informed Juror 8 that she could not discuss the matter with her but advised Juror 8 that she would report the matter to the district judge, which she did. Once the district

judge learned of the problem, he communicated with counsel about the situation that evening (May 9).

First thing the next morning (May 10), the court convened a hearing with counsel and Brown on the matter, where it stated for the record what had transpired the evening before. At the hearing, the district court stated, "[I]t is difficult to tell how serious [the alleged problem] is. It—you know, it could well just be part of the natural frustration or dialogue or tensions that go on in any jury deliberations." For this reason, when the government asked the court to interview Juror 8, the district court responded by asking, "[I]s there something less than doing that, such as just readvising the jury on their duties and responsibilities and having them resume their deliberations that would be sufficient?"

But both parties agreed that "it would [not] be sufficient, given the circumstances, just to bring the jury in and to remind them of their obligations." Defense counsel remarked, "[T]here may not be a problem necessarily with [Juror 13] . . . . There could be an issue with [Juror 8] . . . , if she was discussing this perhaps on the way in or the way out."

The district court acknowledged defense counsel's point that "[i]t could be the first juror that's a problem." Then the court "reluctantly" agreed to inquire of Juror 8.

Juror 8 entered the courtroom, and the district judge instructed her,

8

> Before I ask you any questions or talk to you, I want to make sure that you know that I am not asking you to, nor should you, state or reveal in anything you say your own opinions or positions about any of the deliberations that you've been having or any of the issues in this case, nor should you disclose or discuss the opinions of any of the other jurors about any of the deliberations that have gone on. So I want to be clear about that.

The court next asked the juror to share her concerns. Juror 8 related that she had memorialized her concerns in a letter, which the court copied for the parties. The letter read,

> Your honor
>
> With all due respect, I'm a little concerned about a statement made by Juror #13 when we began deliberation. He said "A Higher Being told me Corrine Brown was Not Guilty on all charges". He later went on to say he "trusted the Holy Ghost". We all asked that he base his verdict on the evidence provided, the testimony of the witnesses and the laws of the United States court. Other members of the Jury share my concern.
>
> Thank You,
>
> Juror #8

After the court and the parties learned of the contents of the letter, the court asked Juror 8 some follow-up questions. In response, Juror 8 said that Juror 13 had made the statement about the "Higher Being" when the jury "first went into deliberation" and that he had commented about the "Holy Ghost" "shortly after, maybe within a few hours after." Upon further questioning, Juror 8 reported that Juror 13 had not made any additional statements to the same effect, that it appeared

9

the juror had been deliberating, and that nothing about the situation was interfering with her own ability to deliberate in compliance with court's instructions. Nevertheless, Juror 8 expressed concern that Juror 13's beliefs about a "Higher Being" and the "Holy Ghost" were "going to interfere in his ability to [deliberate in the way that the court has directed]." Juror 8 also advised that "[s]ome of the jurors are concerned that that's affecting his—his decision."

Then, in response to questions from defense counsel, Juror 8 explained that nobody had asked her to come forward with the information, that she did not think the other jurors were even aware that she had come forward, and that she learned of the other jurors' concerns about the statements during the deliberations, in Juror 13's presence. The court thanked Juror 8 and instructed her to "keep this discussion to [her]self." Then the juror left the courtroom.

The government then argued that the court should question the foreperson. Defense counsel disagreed, asserting that no further steps were necessary.

After hearing the parties' arguments, the court noted that "people pray for guidance and so forth," and that doing so is permissible and "to be respected." Nevertheless, it worried, "[I]f this juror is, in effect, raising some religious view that would prevent him from ever determining that a defendant was guilty on charges or that Ms. Brown was guilty on charges, that is problematic." Putting it in starker terms, the district court wondered aloud what would have happened if Juror 13 had

instead said that he "trusted in the Holy Ghost to find Ms. Brown guilty of all charges."

Defense counsel then suggested that "if [Juror 13] can come out and satisfy the court that he's willing to follow [its] instructions on the law," the court should accept that assurance. The district court responded, "Well, I am certainly open to that possibility[,] . . . but I think I need to ask him."

So the court decided to question Juror 13. Juror 13 entered the courtroom and the following colloquy ensued:

Court:    Do you remember back when you were selected for the jury that one of the questions that [the judge] asked you was whether you had any political, religious, or moral beliefs that would preclude you from serving as a fair and impartial juror in this case? Do you remember that question?

Juror:    I do.

Court:    Okay. And I assume at that time that you answered that question no, is that right, that you did not—

Juror:    That is correct.

Court:    Okay. And is that—is that still the case? Are you having any difficulties with any religious or moral beliefs that are, at this point, bearing on or interfering with your ability to decide the case on the facts presented and on the law as I gave it to you in the instructions?

Juror:    No, [S]ir.

Court:    Okay. Do you consider yourself to have been deliberating with your other jurors according to the law

11

and the instructions that the court gave to you before you went in to deliberate?

Juror:    We have been going over all the individual numbers, as far as—

Court:    Yeah, I don't want to hear anything about the deliberations.

Juror:    Yes, [S]ir.

Court:    But I'm just asking you:  Are you—do you consider yourself to be following the court's instructions in terms of the law and how you go about what you're doing, free from any influence of religion or political or moral beliefs?  Are you able to do that?  Have you been doing that?

Juror:    I've been following—I've been following and listening to what has been presented and making a determination from that, as to what I think and believe.

Court:    Okay.  That's fine.  So let me get a little more specific with you.  Have you expressed to any of your fellow jurors any religious sentiment, to the effect that a higher being is telling you how—is guiding you on these—on these decisions, or that you are trusting in your religion to—to base your decisions on?  Have you made any—can you think of any kind of statements that you may have made to any of your fellow jurors along those lines?

Juror:    I did, yes.

Court:    Okay.  Can you tell me, as best you can, what you said?

Juror:    Absolutely.  I told them that in all of this, in listening to all the information, taking it all down, I listen for the truth, and I know the truth when the truth is spoken.  So I expressed that to them, and how I came to that conclusion.

12

Court:   Okay.  And in doing so, have you invoked a higher power or a higher being?  I mean, have you used those terms to them in expressing yourself?

Juror:   Absolutely.  I told—I told them that—that I prayed about this, I have looked at the information, and that I received information as to what I was told to do in relation to what I heard here today—or this past two weeks.

Court:   Sure.  When you say you received information, from what source?  I mean, are you saying you received information from—

Juror:   My Father in Heaven.

Court:   Okay.  Is it a fair statement—I don't want to put words in your mouth.  But are you saying that you have prayed about this and that you have received guidance from the Father in Heaven about how you should proceed?

Juror:   Since we've been here, [S]ir.

Court:   Do you view that in any way—as you know, when I instructed you, I, as I do for—for all juries—you had told [the judge] that you had no religious or any—you did not have any religious or moral beliefs that would preclude you from serving as a fair and impartial juror, nor did you have any religious or moral beliefs that would preclude you from sitting in judgment of another person.  So you told [the judge] that.  And then you also—of course, you heard my instruction, where you have to base your decision only on the evidence presented during the trial and follow the law as I explained it.  Do you feel that you have been doing that?

Juror:   Yes, [S]ir, I do.

Court:   Do you feel that there is any inconsistency in the prayer that you've had or the guidance you're receiving and

13

your duty to base your decision on the evidence and the law?

Juror:    You said a few—you said a few things. Repeat, please.

Court:    Do you feel that there's any religious tension, or is your religion and your obvious sincere religious beliefs—do you believe it at all to be interfering or impeding your ability to base your decision solely on the evidence in the case and following the law that I've explained to you?

Juror:    No, [S]ir. I followed all the things that you presented. My religious beliefs are going by the testimonies of people given here, which I believe that's what we're supposed to do, and then render a decision on those testimonies, and the evidence presented in the room.

The court instructed Juror 13 to wait outside the courtroom while it conferred with counsel for both sides. The government asserted that Juror 13 had admitted he was "guided by what he believes a deity told him to do, and is apparently implementing that, and not by the court's instructions on the law." For this reason, the government argued, the court should release him and seat an alternate juror in his place. Although defense counsel disagreed, emphasizing that Juror 13 had assured the court he was following the court's instructions and did not say that he was disregarding the court's instructions, he nonetheless conceded that he could "understand the concern that the court would have here with the statement about receiving guidance."

After hearing out counsel, the court proposed asking Juror 13 directly, "Did you ever make the statement that a higher being told me that Corrine Brown was not

14

guilty on all charges?" Neither party objected. So the court brought Juror 13 back into the courtroom, and the following colloquy ensued:

Court:    If you could just have a seat again, [S]ir. And I appreciate your patience with us. And I—I want you to understand I am not criticizing you or saying you did anything wrong. We're just trying to figure some things out here. So what I want to ask you is a fairly direct question:

          Did you ever say to your fellow jurors or to a fellow juror during your—during the time that y'all worked together, when the 12 started, something to this effect, A higher being told me that Corrine Brown was not guilty on all charges? Did you say something like that? Did you say that or something like that to any of your fellow jurors?

Juror:    When we were giving why we were—insight, as far as not guilty or whatever for the first charge, yes.

Court:    Did you say the words, A higher being told me that Corrine Brown was not guilty on all charges?

Juror:    No. I said the Holy Spirit told me that.

Court:    Okay. And you—and I don't want to get into your deliberations. But at what point in the deliberations was that? Was it at the beginning? Was it early in the deliberations? When was it?

Juror:    I mentioned it in the very beginning when we were on the first charge.

The court sent Juror 13 back to the jury room.

## C.

Based on this exchange, the government asked the court to excuse Juror 13 and seat the first alternate juror. Defense counsel disagreed. He argued the court

15

should interpret Juror 13's statement as that of a person of deep faith "saying that something he believed beforehand had been reaffirmed by the evidence that he saw."

In resolving the issue, the court noted that "a district court should excuse a juror during deliberations only when no substantial possibility exists that she's basing her decision on the sufficiency of the evidence." Turning to the facts, the court recognized that unlike in other cases, Juror 13 had not announced that he was unwilling or unable to follow the court's instructions. Rather, the juror assured the court that he believed he was applying the court's instructions properly. And, the court explained, "the fact that somebody prays for guidance or is seeking guidance from whatever religious tradition they come from is perfectly appropriate and not a grounds to dismiss a juror, necessarily." Nevertheless, the court announced that it would excuse Juror Number 13 based on the following reasoning:

> In this case, Juror N[umber] 13, very earnest, very sincere, I'm sure believes that he is trying to follow the court's instructions, I'm sure believes that he is rendering proper jury service, but, upon inquiry and observing Juror N[umber] 13, there is no question that he has made statements that he is, quote, receiving information from a higher authority as part of his deliberative process, and in response to the court's direct inquiry as to whether he had said to other jurors, quote, A higher being told me Corrine Brown was not guilty on all charges, closed quote, Juror N[umber] 13 said that he—what he actually said was that the Holy Ghost or the Holy Spirit told me Corrine Brown was not guilty on all charges.
>
> And a juror who makes that statement to other jurors and introduces that concept into the deliberations, especially—

16

anytime, but this happened to be very early in the deliberations, is a juror that is injecting religious beliefs that are inconsistent with the instructions of the court, that this case be decided solely on the law as the court gave it to the jury and the evidence in the case.

Because, by definition, it's not that the person is praying for guidance so that the person can be enlightened, it's that the higher being—or the Holy Spirit is directing or telling the person what disposition of the charges should be made.

And based upon my reading of the case law in other cases where religious beliefs have caused a juror to be struck, this statement by the juror, which he forthrightly admitted to, and which was accurately, apparently, recounted by Juror N[umber] 8, who brought this to our attention, is a disqualifying statement.

And—and it appears to the court, looking and judging the credibility of Juror N[umber] 13, that he was hesitant at first to explain to me how his religious views have come to the fore during deliberations.

But as we progressed and as he told me he received information from a higher source, and then as he later confirmed the actual statement that the Holy Spirit told him that Ms. Brown was not guilty on all charges, that—that he has expressed views and holds views that I think are inconsistent with his sworn duty as a juror in this case, because he's not able to deliberate in a way that follows the law and instructions that the court gave to him.

I want to be very clear that I am drawing a distinction between someone who's on a jury who is religious and who is praying for guidance or seeking inspiration, or whatever mode that person uses to try to come to a proper decision, from this situation, where the juror is actually saying that an outside force, that is, a higher being, a Holy Spirit, told him that Ms. Brown was not guilty on those charges. And I think that's just an expression that's a

17

bridge to[o] far, consistent with jury service as we know it.

I recognize that whenever you're in the area of religious belief, and—and people who have different ways of expressing their religious beliefs, that you're in territory that's difficult to navigate.

But in my view, the record is clear, and that not only did Juror N[umber] 13 make this statement, but it appears that he continues to believe that he is being told by a higher power how he ought to proceed in these deliberations, and he has shared that with the other jurors, which, again, is essentially a violation, not a—not a willful violation by Juror N[umber] 13, but a violation of the court's instructions to base the decision only on the law and the facts that were adduced at trial, and in accordance with the court's instructions.

Ultimately, the court found "beyond a reasonable doubt" that there was "no substantial possibility" that Juror 13 would be "able to base his decision only on the evidence and the law as the court gave it to him in the instructions" and that Juror 13 was instead "using external forces to bring to bear on his decision-making in a way that's inconsistent with his jury service and his oath." In light of this conclusion, the court excused Juror 13 for good cause.

Then, because Juror 13 had been removed from the jury, the parties agreed that the court should seat the first alternate in his place. After the first alternate joined the jury, the court instructed the jury to start deliberations anew, and the jurors assured the court that they would do so.

**D.**

18

Two jury notes and eleven hours of new deliberations later, the jury found Brown not guilty on four of the fraud counts but guilty on all remaining counts.

Brown moved for a new trial. She argued the court wrongly dismissed Juror 13 because there was a "substantial possibility" that the "holy spirit was actually the juror's own mind or spirit telling him that one or more witnesses had not testified truthfully." The government opposed Brown's motion.

In a written order, the district court denied Brown's motion. Though the court once again acknowledged that "a juror is fully entitled to his religious beliefs and may espouse them," the court found that in this case, Juror 13's "religious beliefs compelled him to disregard [the] instructions [he had received from the court on the law and how to evaluate the evidence] and instead follow direction from the 'Holy Spirit' to find the defendant 'not guilty on all charges.'" Indeed, the court determined that Juror 13 "sincerely believed he had received instructions from an outside source before deliberations began about what his verdict should be . . . ." The court also specifically found that Juror 13's "statement that he was following [the court's] instructions did not convince [the court] that he was able to do so." Juror 13's seeming "unaware[ness] of the inconsistency" between following the court's instructions and taking supposed direction from the Holy Spirit "reinforc[ed] [the court's] belief that he would be unable to follow the Court's instructions even if [ ] again directed [ ] to do so."

19

In addressing the defendant's claim that Juror 13's statement was simply his evaluation of the sufficiency of the evidence, the district court disagreed, calling this assessment "a mischaracterization of the situation[,]" since Juror 13 said "he had expressed a conclusion from the beginning of the deliberations and without discussion with his fellow jurors, in violation of the Court's instructions." Plus, the court continued, Juror 13's statements "necessarily had to impact the overall deliberations because Juror [ ] 13 was telling his fellow jurors that he was basing his verdict on direction apart from those in the Court's instructions." For all these reasons, the court concluded "beyond a reasonable doubt that there was no substantial possibility that [Juror 13] could base his decision on the sufficiency of the evidence and the Court's instructions."

Finally, the court emphasized that its decision did not suggest that persons of religious faith were unsuitable for jury service, but only that all jurors must "render a verdict based on the evidence presented in court."

**E.**

The court sentenced Brown to serve an aggregate sentence of 60 months. It also entered a forfeiture and restitution order. By that order, the court found that Brown had "obtained $664,292.39 in proceeds from the offenses of conviction" and that she was "liable individually" for that amount. Brown did not respond to the government's motion for forfeiture and restitution or object to the court's order.

## II.

In this appeal, Brown first argues that the district court's decision to dismiss Juror 13 was reversible error.  Her contentions fall into four categories:  (1) the district court lacked a sufficient basis to inquire into Juror 13's statements in the first place; (2) the district court abused its discretion when, after questioning Juror 13, it found good cause to excuse him;  (3) Juror 13's responses during the court's inquiry violated Rule 606(b) of the Federal Rules of Evidence;  and (4) the district court's dismissal of Juror 13 constituted plain error because it violated the Religious Freedom Restoration Act ("RFRA") and Brown's First Amendment right to freedom of religion and her Sixth Amendment right to a unanimous jury verdict.  After careful consideration, we are not persuaded by any of these arguments.

We begin with a review of the governing standards.  Federal Rule of Criminal Procedure 23(b)(3) allows the district court, on a finding of "good cause," to excuse a juror after deliberations have begun.[1]  "Good cause" exists only when there is "no substantial possibility" that a juror "is basing her decision on the sufficiency of the evidence." *United States v. Abbell*, 271 F.3d 1286, 1303 (11th Cir. 2001).  We have explained that in this context, "substantial possibility" means "a tangible possibility,

---

[1] In 2002, Rule 23 was amended to replace the term "just cause" with "the more familiar term 'good cause,' that appears in other rules."  Fed. R. Crim. P. 23(b) advisory committee's note to 2002 amendment.  The rule made no change in substance. *See id.*  Because of the change in 2002, cases issued before that time refer to "just cause."  For convenience and to avoid confusion, however, this opinion uses the term "good cause," when discussing those cases.

21

not just a speculative hope," which "basically" amounts to "a 'beyond reasonable doubt' standard." *Id.* at 1302, 1302 n.14.

The "good cause" standard accounts for two competing concerns: (1) it vindicates the defendant's right to a unanimous verdict of guilt by ensuring that a court does not dismiss a juror during deliberations because that juror "'harbors [doubts] about the sufficiency of the government's evidence[,]'" *United States v. Oscar*, 877 F.3d 1270, 1287 (11th Cir. 2017) (quoting *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987) (alteration added)); and (2) it "protect[s] each party's right to receive a verdict rendered by a jury that follows the law[,]" *United States v. Kemp*, 500 F.3d 257, 304 (3d Cir. 2007); *Oscar*, 877 F.3d at 1287.

We review for abuse of discretion a district court's decision to remove a juror during deliberations. *Abbell*, 271 F.3d at 1302. And "we will reverse the district court only if we find that it discharged the juror without factual support, or for a legally irrelevant reason." *Id.* (cleaned up).

With these standards in mind, we evaluate in turn each of Brown's arguments about Juror 13.

## A.

Before we can consider the merits of the district court's decision to remove Juror 13, we must first address Brown's argument that the district court should not have questioned Juror 13 after hearing from Juror 8.

22

We have held that a district court enjoys "broad discretion" in whether and how it chooses to investigate claims of potential "good cause" to remove a juror. *Abbell*, 271 F.3d at 1304 n.20 (citing *United States v. Harris*, 908 F.2d 728, 733 (11th Cir. 1990)). When it comes to a district court's choices concerning the investigation of alleged juror misconduct relating to "statements made by the jurors themselves," we have described that broad discretion as reaching its "zenith." *United States v. Bradley*, 644 F.3d 1213, 1277 (11th Cir. 2011). "The broader the discretion, the greater the range of choice and the less room for reversal." *Id.* at 1280 (citation and quotation marks omitted). Nevertheless, we have "caution[ed] district courts to be careful about invading the secrecy of the jury's deliberations and to err on the side of too little inquiry as opposed to too much." *Abbell*, 271 F.3d at 1304 n.20.

Here, we find no abuse of discretion in the district court's decision to question Juror 13. Juror 8 reported that Juror 13 had stated at the outset of deliberations that "[a] Higher Being told me Corrine Brown was Not Guilty on all charges." Juror 8 further recounted that Juror 13 later said in relation to this remark that he "trusted the Holy Ghost." Though Juror 8 testified that Juror 13 appeared to be deliberating, she nonetheless was still "concerned" that Juror 13's views that a "Higher Being" or the "Holy Ghost" had "told" him of Brown's innocence would "interfere in [Juror 13's] ability to" deliberate in the way that the court had directed in the instructions.

23

The district court reasonably could have viewed this testimony as complaining that Juror 13, while going through the motions of deliberating, was not actually deliberating in the sense of evaluating the evidence before the jury but was instead relying for his position on what he believed he had been "told" by a "Higher Being" or the "Holy Ghost."

Juror 8 also shared her observation that other jurors had likewise expressed "concern" during deliberations that Juror 13's remarks that a "Higher Being" or the "Holy Ghost" had "told" Juror 13 that Brown was not guilty on all counts was affecting Juror 13's decision. The court reasonably could have understood those concerns as further supporting the conclusion that Juror 13 appeared to the other jurors to be relying for his verdict on what he believed a "Higher Being" or the "Holy Ghost" had "told" him to do and to not, in a legal sense, be deliberating.

If, in fact, a juror was not actually deliberating and considering the evidence presented at trial to form his verdict but was rather basing his verdict on what he believed a "Higher Being" or the "Holy Ghost" had "told" him, that would present a serious problem, since it would violate the parties' "right to receive a verdict rendered by a jury that follows the law." *Kemp*, 500 F.3d at 304. Because the district court reasonably concluded that these very circumstances could exist in Brown's case, the district court did not abuse its discretion in making further inquiry.

24

Once the district court determined to continue the investigation, we cannot say it abused its discretion in choosing to further the inquiry by interviewing Juror 13. Even Brown agreed that if the record could justify further inquiry, the court should proceed this way. So while we find no error in the district court's decision to conduct additional investigation by asking Juror 13 questions, even if the court should have set upon a different course of action after it determined it needed to engage in more inquiry, Brown invited any error that may have existed in the district court's particular choice to interview Juror 13. *See United States v. Love*, 449 F.3d 1154, 1157 (11th Cir. 2006) ("It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." (citation and quotation marks omitted)). For that reason, to the extent Brown takes issue with the district court's decision to proceed by interviewing Juror 13 (in addition to her objection to the district court's determination to follow up on its questioning of Juror 8), we do not consider her claim.

## B.

Brown next objects to the district court's determination, after questioning Juror 13, to dismiss him from the jury. This objection potentially requires us to assess two questions. First, we must consider whether the district court clearly erred in its factual findings leading to its decision to dismiss Juror 13. If it did not, we

25

must then address whether, in light of the district court's factual findings, the district court abused its discretion in dismissing Juror 13.  We find no basis for reversal.

To put into perspective the questions we must consider, we begin our inquiry with a brief review of our jury system.  "The jury is a central foundation of our justice system and our democracy."  *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 860 (2017).  For centuries, it "has been an inspired, trusted, and effective instrument for resolving factual disputes and determining ultimate questions of guilt or innocence in criminal cases."  *Id.*  Though the jury system is not without its flaws, juries reach "fair and impartial verdicts" by undertaking "deliberations that are honest, candid, robust, and based on common sense."  *Id.* at 861.  That process engenders the community to accept jury verdicts, "an acceptance essential to respect for the rule of law."  *Id.* at 860.

Bedrock to that trusted system, a juror's deliberations and "verdict must be based upon the evidence developed at the trial[.]"  *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (internal quotation marks omitted); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (same).  That requirement "goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."  *Turner*, 379 U.S. at 472.  Due process also requires "a jury capable and willing to decide the case *solely* on the evidence before it, and a trial judge ever watchful to prevent prejudicial

occurrences and to determine the effect of such occurrences when they happen."
*Smith v. Phillips*, 455 U.S. 209, 217 (1982) (emphasis added).

In other words, if a juror bases his decision on some improper consideration, that deprives the parties of due process and shatters the Sixth Amendment's promise that a jury's verdict will be based on the evidence. As we have noted, the entire premise of a trial and all the precautions underlying the admission and exclusion of evidence exist for the purpose of ensuring that verdicts are determined based on the relevant and reliable evidence presented at trial. So conduct or beliefs that cause a juror's verdict to be rooted in something other than the evidence undermine the jury and trial system as a whole. For these reasons, if our jury system is to be viewed as legitimately convicting or acquitting individuals—a circumstance necessary to the continued vitality of the rule of law in our country—jurors' decisions must be based on the evidence presented at trial.

1.    **The district court did not clearly err when it found that Juror 13 was not capable of returning a verdict based on the evidence adduced at trial**

With these principles in mind, we turn to the district court's factual findings. Brown and the Dissent argue that the district court clearly erred in finding "no substantial possibility" that Juror 13 was capable of rendering a verdict rooted in the evidence and that he would instead, irrespective of the evidence, base his verdict on what he deemed to be a divine revelation from the "Holy Ghost." Instead, Brown and the Dissent assert that the district court should have concluded that Juror 13 was

27

expressing only that he was relying on the "Holy Ghost's" guidance in his own personal and actual evaluation of the evidence adduced at trial. We respectfully disagree that the district court clearly erred in reaching the factual finding it did.

First, we note the record here reflects no question about whether the district court understood the governing law. It clearly did.

The district court repeatedly emphasized that "people pray for guidance and so forth," and that doing so is permissible and "to be respected." On the other hand, the district court properly distinguished a juror who engages in that activity from one who holds a view that "would prevent him from ever determining that a defendant was guilty on charges," describing that circumstance as "problematic." Put simply, the district court understood its mission was to ascertain, based on its observations and Juror 13's testimony, which category Juror 13 fell into.

It also undoubtedly understood that it could dismiss a juror only if it found, beyond a reasonable doubt, "no substantial possibility" that the juror was "basing her decision on the sufficiency of the evidence." *Abbell*, 271 F.3d at 1303. We know this because the district court repeated the standard several times both during the hearing and in its written order. Indeed, it expressly acknowledged that, "[b]ecause of the danger that a dissenting juror might be excused under the mistaken view that the juror is engaging in impermissible nullification[,] a juror should be excused only when no substantial possibility exists that he is basing his decision on

28

the sufficiency of the evidence"—and even then, only when the court makes this finding "beyond a reasonable doubt." Dist. Ct. Order at 18 (cleaned up). Only after acknowledging all these standards did the district court expressly find "beyond a reasonable doubt that there was no substantial possibility [that Juror 13] could base his decision on the Court's instructions and the evidence adduced at trial." *Id.* at 25.

We review the district court's determination on that point for clear error, since it is a factual finding, and there is no question that the district court, in reaching it, applied the correct standards. *Abbell*, 271 F.3d at 1302-03.

The district court is "uniquely situated" to evaluate credibility. *Id.* at 1303. On appeal, we read a "cold record," whereas the district court "had the opportunity to see live testimony." *Id.* (quoting *Owens v. Wainwright*, 698 F.2d 1111, 1113 (11th Cir. 1983)).

And evaluating "the demeanor of the pertinent juror" is particularly critical when it comes to juror-misconduct determinations. *Abbell*, 271 F.3d at 1303. Because of the district court's particular vantage point, we have explained that a district court's factual finding is clearly erroneous only if it leaves us with "a definite and firm conviction that a mistake has been committed." *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012). "It is seldom easy to establish clear error," and it is "especially difficult to do . . . where the district court was on the scene." *United States v. Godwin*, 765 F.3d 1306, 1318 (11th Cir. 2014).

As we have noted, the district court dismissed Juror 13 because, after "inquiry and observ[ation] of [him]," it found "beyond a reasonable doubt that there was no substantial possibility that [Juror 13] could base his decision on the sufficiency of the evidence and the Court's instructions." The district court reached its conclusion after considering and reflecting on Juror 13's own words and the district court's observations of Juror 13 during the inquiry. Only then did the court conclude that Juror 13—regardless of his intent—was not capable of making a decision rooted in the evidence presented at trial and the court's instructions, instead of based on what Juror 13 believed he was "told" by the Holy Spirit to do.[2]

Beginning with his own words, Juror 13 stated that he "received information [from his "Father in Heaven"] as to what [he] was told to do in relation to what [he] heard here . . . this past two weeks"—specifically to find Brown not guilty of all 24 charges. The Dissent makes much of the second part of the quotation—"in relation to what [he] heard here . . . this past two weeks." *See* Dissent at 69-71. It construes this phrase to mean that Juror 13 was expressing that he was basing his verdict on the evidence. And, in a vacuum, that is certainly one reasonable construction. But it's not the only reasonable one. The second part of the quotation could alternatively

_____

[2] The Dissent contends that the district court could not have made that finding "beyond a reasonable doubt" without "know[ing] what was happening in Juror [ ] 13's mind, much less his soul[.]" Dissent at 115. We, however, are confident that district courts, like jurors in criminal cases, may reach that level of confidence based on direct and circumstantial evidence and without perfect insight into one's mind or soul.

mean that Juror 13 "received information [from his "Father in Heaven"] as to what [he] was told to do in relation to" the trial, generally. So it was the district court's job to determine, if it could, based on Juror 13's complete testimony and the district court's observations of Juror 13's demeanor during the proceedings, which of these things Juror 13 meant. Ultimately, after the district court heard all of Juror 13's testimony and evaluated his demeanor, it found that there was no substantial possibility that Juror 13's statement meant what the Dissent suggests. Rather, the court concluded, it meant that Juror 13 understood himself to have received directions from the Holy Spirit to acquit Brown on all charges presented at the trial, irrespective of an independent assessment of the evidence.[3]

The court did not jump to this conclusion. Rather, when the district court was unsure of what Juror 13 meant, it followed up with him. And Juror 13 later made comments showing he was relying on the "information" he "received" from his "Father in Heaven" to reach his verdict, irrespective of the evidence presented at

---

[3] The Dissent contends that we "ignore[]" Juror 13's general references to the evidence and "repeatedly misrepresent[] Juror No. 13's position as being 'irrespective of the evidence.'" Dissent at 63. The Dissent misunderstands our point. The question is not whether Juror 13 generally referenced the evidence as a whole at some point or points during the colloquy; we expressly acknowledge that he did. *See*, *e.g.*, *supra* at 31. Indeed, that is what this part of our discussion is about. The question is instead whether, despite his generalized statements, on this record, Juror 13 indicated he was not capable of basing his verdict on the evidence, in light of his perceived divine revelation. Because we conclude that the district court did not clearly err in determining Juror 13 was not capable of basing his verdict on the evidence—despite Juror 13's general references to the evidence as a whole—we speak in terms of what the district court found Juror 13 was actually doing, as opposed to what Juror 13's "position" was, when we state that Juror 13 relied on his perceived divine revelation, "irrespective of the evidence."

31

trial.  In this regard, Juror 13 volunteered that he advised his fellow jurors that "the Holy Spirit told me that ["Corrine Brown was not guilty on all charges"]," to provide "insight" to them into why he believed Brown was not guilty.  In other words, to justify the reason for his intended verdict, Juror 13 relied solely on his perceived divine revelation, as opposed to any evidence presented at trial or any court instruction.

The district court also pointed to the fact that Juror 13 talked about "all charges" when he remarked that the Holy Spirit told him Brown was not guilty— even though Juror 13 made this statement at the beginning of deliberations, at a time when the jurors were supposed to be examining only the first count.  *See* Dist. Ct. Ord. at 22 ("Juror No. 13 admitted that he announced to his fellow jurors when they began deliberating on the first charge that the Holy Spirit told him that Corrine Brown was not guilty 'on all charges.'").  As the district court recognized, when Juror 13 commented on all the counts simultaneously, he was demonstrating that he could not examine the evidence as it related to each count individually but rather was tied to resolving each claim based solely on what he perceived the Holy Spirit told him to do with respect to the case as a whole, irrespective of the evidence.  That

32

too supported the district court's conclusion that Juror 13 was unable to make a decision rooted in the evidence.[4]

And during his colloquy with the district court, Juror 13 did not on his own characterize his religious inspiration as mere "guidance." Rather, it was the court that mentioned "guidance" during the colloquy. In contrast, Juror 13's self-worded responses to the court's open-ended questions consistently characterized the message he believed he received as a directive or conclusion. As we have noted, initially, Juror 13 stated that he "received information" from "My Father in Heaven" "as to what I was *told to do*." (emphasis added). And later Juror 13 confirmed that he advised the other jurors that "the Holy Spirit told" him that "Corrine Brown was not guilty on all charges." In short, without stating that the Holy Spirit provided mere "guidance," Juror 13, unprompted, himself characterized his perceived divine revelation as the Holy Spirit's conclusion.

---

[4] Based on the district court's emphasis of the words "on all charges" from Juror 13's quotation, the Dissent suggests that the district court improperly may have dismissed Juror 13 "because Brown was charged with 24 counts, [so] she *must* be guilty of at least some of them." Dissent at 110-12. Of course, if the district court had dismissed Juror 13 for that reason, that would be improper and would require reversal. But the Dissent points to nothing to support its theory. Nor can it. It is clear from the district court's statement that "Juror No. 13 . . . announced to his fellow jurors *when they began deliberating on the first charge* that the Holy Spirit told him that Corrine Brown was not guilty on all charges" (and the order as a whole) that the district court relied on the words "on all charges" to show that Juror 13 was not, in fact, able to consider the evidence as it related to a single individual count but was rather wholesale applying his perceived divine revelation to every count, irrespective of the evidence, just as he perceived the Holy Spirit told him to do. (emphasis added).

33

The district court also noted that Juror 8 reported that Juror 13 had twice made statements about receiving direction from the Holy Spirit and that these statements had occurred some hours apart—once at the start of deliberations, during the jury's discussion of the first of 24 charges, and again later that day.[5]  In other words, even after the jury had been engaged in deliberations for hours, Juror 13 continued to adhere to his belief that "the Holy Spirit told [him]" that "Corrine Brown was not guilty on all charges."  The district court reasonably could have construed this second statement as indicating that, despite sitting through deliberations, Juror 13 was not actually considering the evidence and would not base his verdict on it, but rather would base his verdict on what he believed the Holy Spirit had "told" him about Brown's guilt.

Besides Juror 13's own words, the district court found that Juror 13 "was hesitant at first to explain . . . how his religious views ha[d] come to the fore during deliberations."  After all, the district court's colloquy shows that it asked repeated

---

[5] The Dissent speculates that after initially telling the other jurors about his perceived divine revelation, Juror 13 "stopped using" "religious language."  Dissent at 105.  The record, however, belies that speculation.  Juror 8 testified that Juror 13 stated both at the outset of deliberations and then again a few hours later comments to the effect that the Holy Spirit told him Brown was not guilty on all counts.  So, by his own words, Juror 13, was continuing to base his verdict not on the evidence but instead on his perceived divine revelation—even after hours of deliberations.  The district court credited Juror 8's testimony in this regard, and the Dissent has pointed to nothing that shows the district court's decision to do so was clear error.  Nor does the Dissent's sheer speculation about what might have occurred in the jury room provide any basis to conclude the district court clearly erred in finding "that Juror [ ] 13 would continue in the same vein if permitted to remain."  Plus, regardless of how often Juror 13 made his statement, if he demonstrated to the district court during its inquiry that he was unable to base his verdict on the evidence, the district court was right to dismiss him.

specific questions to Juror 13 about "any kind of statements" he "may have made" to the other jurors "to the effect that a higher being [was] telling [him] how—[was] guiding [him] on these—on these decisions." The court even asked "Can you tell me, as best you can, what you said" in this regard. In response, Juror 13 did not state that he had said to the other jurors that the Holy Spirit had told him Brown was not guilty on all charges. Rather, Juror 13 spoke in generalities. In fact, he did not disclose his actual statement until the district court dismissed him momentarily, brought him back in, and then asked him point-blank whether he had made the specific statement, "A higher being told me that Corrine Brown was not guilty on all charges?".

Throughout these proceedings, which lasted over an hour and a half, the district court considered the evidence before it and evaluated Juror 13's credibility and demeanor. Accounting for all of these observations and Juror 13's own words, the district court, "looking [at] and judging the credibility" of Juror 13, concluded that, on this particular record, Juror 13's belief that the Holy Spirit "told" him that Brown was innocent prevented Juror 13 from fulfilling his duty to follow the court's instructions about the law and base his verdict on the evidence presented at trial.

On review of this record, we are not left with the "definite and firm conviction" that the court committed a mistake when it determined that there was no

substantial possibility that Juror 13 would rely for his decision on the evidence at trial. *See Almedina*, 686 F.3d at 1315.

The Dissent's argument that the district court clearly erred in its factual finding because Juror 13 himself stated he (sincerely) believed that he was deliberating in accordance with the court's instructions is not convincing. *See* Dissent at 76-77. The juror is not the factfinder on issues of juror misconduct. So a juror's self-assessment of his ability to decide a case solely on the evidence cannot be the beginning and end of a district court's basis for determining whether a juror should be dismissed, when a juror has demonstrated that he cannot, in fact, reach a verdict rooted in the evidence. Here, the district court did not ignore Juror 13's statements about his ability to follow the court's instructions. To the contrary, the district court explicitly accounted for them and for Juror 13's sincerity and earnestness. Nevertheless, even considering all these factors, the district court concluded that Juror 13's "statement that he was following [the court's] instructions did not convince [the court] that he was able to do so." For the reasons we have explained, we find no clear error in that factual finding.

**2.    The district court did not abuse its discretion in dismissing Juror 13 after finding that he was not capable of reaching a verdict based on the evidence**

Because the district court did not clearly err in finding that Juror 13 was not capable of deciding the case based on the evidence, we must consider whether the

36

district court, in light of this determination, abused its discretion when it decided to dismiss Juror 13. *See Godwin*, 765 F.3d at 1316 (citing *United States v. Register*, 182 F.3d 820, 839-40 (11th Cir. 1999)).  We conclude that it did not.

As we have discussed, a juror must base his verdict upon the evidence presented at the trial.  An inability to follow that rule serves as good cause for a district court to excuse a juror.  *See Godwin*, 765 F.3d at 1316.[6]  Indeed, once the district court permissibly determined that there was no substantial possibility Juror 13 could reach a verdict rooted in the trial evidence, excusing the juror was the only correct course of action to preserve the integrity of the jury's fact-finding function.

We are not persuaded by Brown's arguments to the contrary.  She first asserts the district court could not excuse Juror 13 because it found that his violation of the

---

[6] The Dissent claims we have failed to "grapple[] with" Eleventh Circuit caselaw, such as *Godwin*, which involved the dismissal of jurors when the jurors themselves stated that they were unable to follow the law.  Dissent at 59-60.  But there is nothing to "grapple[] with."  That we approved of juror dismissals when the facts in those cases required us to do so does not somehow suggest that a district court may dismiss jurors *only* when such facts are present.  *United States v. Thomas*, 116 F.3d 606, 622 (2d Cir. 1997), and *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987), out-of-Circuit cases that the Dissent cites for the proposition that "when a juror speaks in terms of the evidence in explaining his position, we cannot say that it is beyond doubt that the juror's position during deliberations was the result of his defiant unwillingness to apply the law, as opposed to his reservations about the sufficiency of the Government's case," Dissent at 62-63 (cleaned up), are similarly inapplicable.  There, the jurors at issue were incorrectly dismissed for refusal to apply the law, even though the jurors stated that the evidence did not support guilt.  At no point during the proceedings in those cases did the district courts have reason to believe that the jurors there were not capable of deciding the case based on the evidence.  Nor did the district courts there find beyond a reasonable doubt that the jurors would not, in fact, decide the case on the evidence.  So on those records, the district courts erred in dismissing the jurors in *Thomas* and *Brown*.  But here, Juror 13 did not refuse to decide the case on the evidence;  rather, the court found he was not capable of doing so, despite his best efforts.  And as we have explained, we cannot find clear error in that conclusion on this record.

court's instructions was not "deliberate."  But a juror's misconduct need not be deliberate to provide good cause to excuse that juror.  *See*, *e.g.*, *United States v. Wilson*, 894 F.2d 1245, 1249-51 (11th Cir. 1990).  If a juror cannot base his verdict on the evidence adduced at trial—no matter the reason why—good cause to excuse that juror exists.  For the same reason, that the district court found Juror 13 to be "earnest" and "sincere" in his belief about his ability to follow the court's instructions did not preclude it from dismissing him in the circumstances here, where the court concluded that, despite his good intentions, Juror 13 was simply not capable of deciding the case based on the evidence.

Nor, as the Dissent contends, do we hold that statements about perceived divine revelations "prove 'by definition' that [the juror's] thought processes were improper."  Dissent at 96.  No doubt, on a different record, where a district court evaluates the demeanor of a different juror, that court might find a juror's statements about his perceived divine revelations to be merely "idiom[s]," Dissent at 99, 106-07, used to describe only prayer, and that court might conclude that that juror will base his verdict on the evidence.  We would, of course, review such a finding using the same deferential lens we apply here.  But on the present record, we cannot say that the district court clearly erred when it determined Juror 13 was incapable of deciding the case based on the evidence and instead would reach a verdict because the Holy Spirit told him what that verdict should be, irrespective of the evidence.

Brown also argues that our affirmance of the district court's decision to excuse Juror 13 conflicts with *State v. DeMille*, 756 P.2d 81 (Utah 1988). But to the extent that is true, we are not bound by *DeMille*. Nor do we find it persuasive.

In *DeMille*, after the jury returned a guilty verdict, the court learned that a juror revealed during deliberations that earlier in the trial, she had prayed for a sign concerning the defendant's guilt. *DeMille*, 756 P.2d at 83. In response to her prayers, this juror stated, she had received a divine revelation that the defendant was guilty if defense counsel did not make eye contact with the juror during closing argument. *Id.* So when defense counsel did not make eye contact with the juror during his closing argument, the juror voted to convict, based on that circumstance. *Id.* Despite this occurrence, the trial court denied the defendant's motion for a new trial, and the Supreme Court of Utah affirmed. *Id.* at 82, 84-85. In reaching this conclusion, the Utah court reasoned that if it determined otherwise, it "would implicitly be holding that it is improper for a juror to rely upon prayer, or supposed responses to prayer, during deliberations." *Id.* at 84.

We are not persuaded by *DeMille* for two reasons.

First, the posture of *DeMille* differed from Brown's case in an important way. In *DeMille*, the juror issue arose under Utah's equivalent of Rule 606(b), Fed. R. Evid., after the jury had already returned the verdict. In Brown's case, though, the judge dismissed Juror 13 before deliberations ended, so as we explain in Section

39

II.C. below, a different standard governed the inquiry.  As a result, *DeMille* is not instructive here.

Second, the *DeMille* juror confessed that the decisive factor in her guilty vote relied solely on the fortuity of whether defense counsel happened to make eye contact with her during closing argument—something that occurred (or actually, did not occur) before the jury even began deliberations.  By her own admission, then, the *DeMille* juror did not reach her guilty verdict during deliberations.  Nor did she find the defendant guilty as a result of considering the evidence adduced at trial.  Even if we assume that a post-verdict case such as *DeMille* is instructive on the standard for dismissing a juror *during* deliberations, we do not agree that it is acceptable under our system of justice to convict someone and send them to jail not because of the evidence but rather simply because his counsel had poor eye contact.[7]

There is certainly nothing wrong with jurors choosing to pray for wisdom and guidance in adjudging the evidence.  But in our system, ultimately, jurors must root their verdicts in the evidence and the court's instructions on the law.  Because the district court permissibly found that Juror 13 was unable to comply with that cardinal precept, it did not abuse its discretion by excusing Juror 13 based upon that finding.

---

[7] Though it favorably cites *DeMille* two times, Dissent at 91, 94, the Dissent does not indicate whether it believes the principles of that Rule 606(b) case apply to the mid-deliberations context.  To the extent the Dissent believes *DeMille* is applicable here, it provides no support for that position and we respectfully disagree.

Finally, we must address the Dissent's contentions that our decision today "ordains district courts with broad discretion to dismiss any juror who confesses receiving guidance from God" and "makes it far more difficult for the citizens of our Circuit to be judged by juries that represent a cross-section of their communities." Dissent at 54. Not so.

Nothing about our decision requires or even permits the dismissal of a juror simply because of the proclaimed strength of his religious beliefs. Rather, today's ruling reaffirms that a district court must engage in a case-by-case evaluation when faced pre-verdict with plausible allegations that a juror may not decide the case based on the evidence. Under that framework, a district court may dismiss a juror pre-verdict only after evaluating all the evidence and making a specific determination in the circumstances of that case that that particular juror will not base his verdict on the evidence—regardless of the reason for the juror's failure or inability to do so.

So today's ruling does nothing more than revalidate the well-established and crucial principle that jurors must decide cases based on the evidence. If a juror is not capable of conforming to that rule, it makes no difference why that is so.

Here, the district court dismissed Juror 13, plainly and simply, because on this particular record, it concluded as a matter of fact that Juror 13 was not capable of rendering a verdict based on the evidence. Our holding today is a very narrow one, based on the particular facts of this record. That record reflects that the district court

41

was very careful to ensure it was not dismissing Juror 13 because of Juror 13's faith or because Juror 13 had prayed for and thought he had received guidance in evaluating the evidence and in actually making a decision based on that evidence. The district court showed that it understood—and we take this opportunity to emphasize—these things are allowed under our system and continue to be permitted fully under our decision today, whether jurors believe they communicate with a higher being or not, *see* Dissent at 113, as long as the juror is willing and able to root his verdict in the evidence.

It should also go without saying—though we must because the Dissent suggests otherwise—that the rule dismissing jurors who cannot or will not decide cases based on the evidence does not discriminate against African Americans and evangelical Christians. *See* Dissent at 54, 112-115. Rather, it safeguards them and everyone else equally, by protecting the cornerstone of our Constitution's guarantee that a person will not find himself convicted of a crime for a reason that is not based on the evidence.

The Dissent frames its argument in terms of unfairness to defendants. But there is nothing unfair about dismissing a juror who shows himself to be incapable of arriving at a verdict based on the evidence. As we have explained, the reason we have trials is so we can secure verdicts based on the evidence.

42

On the other hand, the Dissent's position would unfairly allow a defendant to be convicted based not on the evidence presented at trial but instead on a juror's belief that a divine being had told the juror of the defendant's guilt, irrespective of the evidence. In fact, the Dissent does not contest this proposition. Worse, in the Dissent's view, so long as such a juror sincerely believed he was following the court's instructions, the district court would be powerless to preserve the defendant's right to be convicted based on only the evidence presented at trial. In short, we think the real injustice would be allowing jurors who are incapable of basing their verdict on the evidence to convict our citizens. And our Constitution does not allow for such an outcome.

## C.

Next, Brown contends that the court's inquiry into Juror 13's statement violated Rule 606(b) of the Federal Rules of Evidence. Once again, we disagree: Rule 606(b) did not apply to the court's inquiry.[8]

As relevant here, Rule 606(b) governs the admissibility of juror testimony as it relates to the validity of a verdict. It provides, in relevant part,

(b) During an Inquiry into the Validity of a Verdict . . . .
(1) Prohibited Testimony or Other Evidence. During an inquiry into the validity of a verdict . . . , a juror may not testify about any statement

---

[8] The parties dispute whether Brown preserved this argument. Because Rule 606(b) did not apply to the proceeding in question, even if Brown did not forfeit the argument, the debate over whether we should review the issue for an abuse of discretion or for plain error is academic, and we therefore apply the abuse-of-discretion standard.

made or incident that occurred during the jury's deliberations;  the effect of anything on that juror's or another juror's vote;  or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(2) Exceptions.  A juror may testify about whether:

    (A)  extraneous prejudicial information was improperly brought to the jury's attention;

    (B)  an outside influence was improperly brought to bear on any juror; or

    (C)  a mistake was made in entering the verdict on the verdict form.

By its own terms, nothing in Rule 606(b) applies to mid-deliberation inquiries into alleged juror improprieties.  *See* Fed. R. Evid. 606(b); *Warger v. Shauners*, 574 U.S. 40, 44-45 (2014).  Rather, as the Supreme Court has recently explained, this rule protects against "disrupt[ing] the finality of the process" and "undermin[ing] both jurors' willingness to return an unpopular verdict and the community's trust in a system that relies on the decisions of laypeople."  *Pena-Rodriguez*, 137 S. Ct. at 866 (cleaned up).  It also addresses the concern that "if attorneys could use juror testimony to attack verdicts, jurors would be harassed and beset by the defeated party, thus destroying all frankness and freedom of discussion and conference" during deliberations.  *Id.* (cleaned up).

But a court's inquiry into allegations of juror misconduct that have come to the court's attention *before* a verdict is rendered, as in this case, cannot affect the finality of the process because when such an inquiry occurs, the process, of course, has not yet become final.  Nor does it open all deliberations to inquiry or attack,

44

since it does not permit attorneys the right to investigate the deliberations, as the absence of Rule 606(b) would do to verdicts, and it allows district courts to make only limited inquiry of jurors and only when the circumstances warrant it. So pre-verdict inquiries into allegations of juror misconduct do not fall within Rule 606(b)'s bailiwick, either by the rule's terms or by its purposes.

**D.**

Finally, Brown argues that, in excusing Juror 13, the court violated the RFRA, the First Amendment, and the Sixth Amendment. Brown did not advance these claims below, so we review for plain error. *United States v. Harris*, 886 F.3d 1120, 1127 (11th Cir. 2018).

To meet the standard for plain error, Brown must show that there was error, that the error was plain, that the error affected her substantial rights, and that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732-34 (1993). We have emphasized that "there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving [the issue]." *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003).

Brown identifies no precedent resolving her arguments based on the RFRA. Nor does she point to binding precedent on her First Amendment or Sixth

45

Amendment arguments. As a result, she cannot demonstrate plain error for this reason alone, and her challenges must fail.

Nevertheless, it is worth noting that Brown cannot show error on the merits, either. As her claims relate to the RFRA, that statute provides that the "Government shall not substantially burden a person's exercise of religion" unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b). Ensuring that jurors in criminal cases are "able to follow the law and apply the facts in an impartial way" is surely a compelling governmental interest. *United States v. Mitchell*, 502 F.3d 931, 954 (9th Cir. 2007).

And "excluding jurors who are unable to" impartially follow the law and apply the facts of a case—even if it is on account of their constitutionally protected religious beliefs—is the "least restrictive means to achieve that end." *Id.* Indeed, when a juror's protected religious beliefs conflict with the ability of the jury system to function and with due process at trial, it is incumbent upon the judge presiding over the trial to separate the juror from the proceeding. By protecting the jury system and due process, of course, the trial judge does not limit the juror's religious freedoms.

46

Brown's constitutional arguments are no more persuasive.  In particular, she asserts that Juror 13 had a First Amendment right to serve on a jury without disqualification on the basis of his religious beliefs and that, by removing the juror, the trial court violated Brown's Sixth Amendment right to a trial by a lawfully empaneled jury.  Brown likens her argument to the one underlying *Batson v. Kentucky*, 476 U.S. 79 (1986).  She contends that just as a prosecutor is not permitted to exercise a peremptory strike on a prospective juror solely on account of the juror's race, the trial court could not excuse Juror 13 because of his religion.[9]

But here, the district court did not dismiss Juror 13 because of Juror 13's religion.  Rather, it dismissed him because it found him incapable of rendering a verdict rooted in the evidence.  So long as the district court's ruling in that respect was not clearly erroneous, it makes no difference why Juror 13 was incapable of arriving at a verdict based on the evidence.

## III.

Brown also appeals from the district court's forfeiture order.  She concedes that she did not raise an objection to that order before the district court but contends that the court's order constituted plain error.  Brown argues that, under *Honeycutt v.*

---

[9] While we can certainly appreciate the general concern that otherwise-capable jurors should not be dismissed because of their religious beliefs, for the sake of completeness, we must note that, perhaps surprisingly, the question of whether a juror's religion may be relied upon in the empaneling a jury is not currently a settled one.  *See*, *e.g.*, *United States v. Heron*, 721 F.3d 896, 902 (7th Cir. 2013); *United States v. Brown*, 352 F.3d 654, 666-70 (2d Cir. 2003); *United States v. DeJesus*, 347 F.3d 500, 509 n.7 (3d Cir. 2003) (collecting cases).

*United States*, 137 S. Ct. 1626 (2017), 21 U.S.C. § 853 did not authorize the court to order her joint and severally liable for property that a co-conspirator derived from the crime.

Brown's argument is deeply flawed. Brown premises her argument on her assertion that the district court's forfeiture order was issued "pursuant to 21 U.S.C. § 853." That statute mandates forfeiture upon conviction for certain drug crimes. Brown was not found guilty of any drug crimes, so 21 U.S.C. § 853 is irrelevant to her case. Instead, the district court properly issued its forfeiture order under the authority of 18 U.S.C. § 981(a)(1)(C). This grave error on Brown's part is fatal to her argument, since the decision in *Honeycutt* was highly dependent on language found in 21 U.S.C. § 853 but absent from 18 U.S.C. § 981.

And even if we were inclined to apply *Honeycutt* to forfeiture orders authorized by 18 U.S.C. § 981, Brown's argument would still fail. Brown relies on *Honeycutt* for the proposition that "forfeiture pursuant to 21 U.S.C. § 853 'is limited to property the defendant himself actually acquired as the result of the crime.'" Here, though, the district court found the United States had "established that [Brown] obtained" the full forfeiture amount "as a result of the offenses of conviction" and therefore ordered that she was liable for that amount "individually." Since the district court concluded that Brown had "acquired" the full amount at issue and that

48

she was "individually" liable for it, the concerns raised in *Honeycutt* are completely absent from her case.

For these reasons, the district court's forfeiture order was not plain error.

## IV.

For the reasons we have explained, we affirm the judgment of the district court.

**AFFIRMED**.

CONWAY, District Judge, concurring specially:

I concur in Judge Rosenbaum's opinion because it correctly characterizes the record in this case, and it correctly analyzes the law of juror removal consistent with *United States v. Abbell*, 271 F.3d 1286 (11th Cir. 2001). I write separately to emphasize that this is not a case which turns on a juror's religious beliefs or religious freedom to engage in prayer or seek guidance during deliberations when applying the law to the evidence in the case. Rather, it is a straightforward case about whether the district court—having concluded based on direct questioning that a juror was not following the court's instructions—abused its discretion in dismissing that juror based on an assessment of the juror's credibility and capacity to follow the court's instructions. Whenever a district court determines that *any* factor extrinsic to the trial—whether a juror's stubborn unwillingness to follow the law or evasive answers about that obligation—has so strongly influenced a juror that there is "no substantial possibility" he will base his decision on the evidence in the case, the decision to dismiss the juror is not an abuse of discretion. *See id.* at 1303-04 (affirming dismissal of juror who told other jurors that she was not going to follow the law and, after further instructions from the court, continued in her refusal to consider the evidence or discuss the applicable law); *United States v. Augustin*, 661 F.3d 1105, 1132 (11th Cir. 2011) (affirming dismissal of juror who responded evasively and with long pauses to the court's questions that she was

50

"willing to follow" the court's instructions, "[b]ut I'm still entitled to my own—you know, what I feel").

Following hesitant answers to the court's initial set of questions, Juror 13 admitted in response to the district court's direct question that he had expressed to the rest of the jurors at "the very beginning" of deliberations that "the Holy Spirit told" him Brown was not guilty on all charges. The district court's decision to dismiss Juror 13 was based on "inquiry and observ[ation]" of Juror 13 during the court's questioning. "[B]ecause the demeanor of the pertinent juror is important to juror misconduct determinations, the district court is uniquely situated to make the credibility determinations that must be made in cases like this one: where a juror's motivations and intentions are at issue." *Abbell,* 271 F.3d at 1303 (citation omitted).

Thus, I concur that the district court's determination that Juror 13 was not complying with the court's explicit instructions to decide the case solely on the law and the evidence in the case was not an abuse of discretion on the record before us.

51

WILLIAM PRYOR, Circuit Judge, dissenting:

> *Do each of you solemnly swear that you will well and truly try the case now before this court and render a true verdict, according to the law, evidence, and instructions of this court, so help you God?*

Every juror who was empaneled in Corrine Brown's criminal trial swore this oath. One of them was dismissed because he apparently meant it. By approving his dismissal, the majority erodes the "tough legal standard" governing the removal of deliberating jurors and imperils the sanctity of the right to trial by jury. *United States v. Abbell*, 271 F.3d 1286, 1302 (11th Cir. 2001) (requiring that juror misconduct be proven "beyond reasonable doubt" before dismissing a deliberating juror). And it does so in an especially troubling manner: after admitting that "one *reasonable* construction" of the record supports the view that this juror rendered proper service, it holds that the district court's adverse reaction to the way this juror talked about God nevertheless proved "beyond a reasonable doubt" that the juror engaged in misconduct. Majority Op. at 29–31 (emphasis added).

Over an hour and a half on the third day of jury deliberations, the district court investigated a concern about a juror who, on the first day, reportedly twice used religious language to express his position. During that hour and a half, the suspect juror repeatedly affirmed that he was basing his decision on the evidence. He even explained that he considered it his religious duty to do so. The district court thought he meant what he was saying; in the district court's words, the

52

suspect juror was "very earnest" and "very sincere." The other juror who had raised the concern agreed that the suspect juror was deliberating, and she implied that he had not said anything worrisome during the second day of deliberations. Indeed, she never even accused him of misconduct.

But none of these encouraging signs mattered once the suspect juror confirmed that, near the start of deliberations, he had said something to the effect of "the Holy Spirit told me that Corrine Brown was not guilty on all charges." With next to no context—and no other evidence of misconduct—the district court deemed this statement "an expression that's a bridge too far, consistent with jury service as we know it," and conclusive proof that the juror was "using external forces to bring to bear on his decision-making in a way . . . inconsistent with his jury service and his oath."

To be sure, the risk of juror misconduct in deliberations is one of the most sensitive problems that can arise in a criminal trial, and the district court took its responsibilities seriously. Alas, to err is human, to forgive divine, but forgiveness is not a comfort afforded to a court of appeals. And the district court's error in this appeal is clear. If this devout juror's religious language alone proved his misconduct "beyond reasonable doubt," *Abbell*, 271 F.3d at 1302, then the phrase "reasonable doubt" has changed its meaning.

53

The majority opinion suffers from several flaws. Foremost, it fails to adhere to our precedents governing the dismissal of a juror. Our precedents impose a "tough" standard of proof—indeed, the highest standard of proof known to law, "beyond a reasonable doubt"—before a district court can purge a deliberating juror. After paying lip service to this standard, the majority ordains district courts with broad discretion to dismiss any juror who confesses receiving guidance from God. But the majority fails to view that discretion through the lens of the tough standard imposed by our precedents, and so it fails to appreciate why the limited record below does not satisfy our standard. The majority then compounds these errors by misconstruing the import of the juror's religious statements—which were spoken in the vernacular of a substantial segment of our citizenry—and by failing to understand why these statements were not *conclusively* disqualifying. The upshot of these errors is that the majority's decision makes it far more difficult for the citizens of our Circuit to be judged by juries that represent a cross-section of their communities. Indeed, it even provides discriminating lawyers with a tool to target and eliminate certain demographics from jury service. For example, African American and evangelical Christians are more likely than others to believe that God speaks to them, and the majority's decision now requires that these eligible jurors be stricken for cause if a discriminating lawyer elicits during voir dire that God communicates with them. For these reasons, I must dissent.

54

### A.  *The Standard of Proof for the Dismissal of a Deliberating Juror Is Rigorous.*

The Anglo-American legal tradition has regarded few rights as more sacred than that of a criminal defendant to be tried by a jury of his peers. To Blackstone, it was "the glory of the English law," "the most transcendent privilege," and "[a] constitution, that . . . ha[d], under providence, secured the just liberties of [the English] nation for a long succession of ages." 3 William Blackstone, *Commentaries* *379. Our Founding generation thought the right to a criminal jury so precious that it enshrined it in the Constitution twice. *See* U.S. Const. Art. III, § 2 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury . . . ."); *id.* Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."). Justice Story went as far as to write that the Constitution "would have been justly obnoxious to the most conclusive objection, if it had not recognised, and confirmed [this right] in the most solemn terms." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1773, at 653 (Cambridge, Brown, Shattuck & Co. 1833).

The right of trial by jury "is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." *Blakely v. Washington*, 542 U.S.

55

296, 305–06 (2004). In particular, "[t]he jury trial right protects [defendants] from being judged by a special class of trained professionals who do not speak the language of ordinary people and may not understand or appreciate the way ordinary people live their lives." *Pena–Rodriguez v. Colorado*, 137 S. Ct. 855, 874–75 (2017) (Alito, J., dissenting). "Jurors *are* ordinary people. They are expected to speak, debate, argue, and make decisions the way ordinary people do in their daily lives. Our Constitution places great value on this way of thinking, speaking, and deciding." *Id.* at 874 (emphasis added). So, when a criminal defendant insists on his right to a jury, he "is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). And, in federal trials, the Constitution requires a unanimous guilty verdict to convict. *See Sanchez v. United States*, 782 F.2d 928, 931 (11th Cir. 1986).

The jury system protects defendants by establishing a critical division of labor between the judge and the jury. Although the judge's role is "to instruct the jury on the law and to insist that the jury follow his instructions," it remains "the jury's constitutional responsibility" both "to determine the facts" and "to apply the law to those facts [to] draw the ultimate conclusion of guilt or innocence." *United States v. Gaudin*, 515 U.S. 506, 513–14 (1995). As an inaugural justice of the Supreme Court insisted long ago, "[i]t is of the greatest consequence . . . that the powers of the judges and jury be kept distinct: that the judges determine the law,

56

and that the jury determine the fact. This well-known division between their provinces has been long recognised and established." 2 James Wilson, Lectures on Law (1790–91), *in The Works of the Honourable James Wilson* 3, 371 (Phila., Lorenzo Press 1804).

Because our jury system works only when both the judge and the jury respect the limits of their authority, it is well settled that "[j]ust cause exists to dismiss a juror when that juror refuses to apply the law or to follow the court's instructions." *Abbell*, 271 F.3d at 1302 (internal quotation marks omitted). Such a juror abdicates his "constitutional responsibility," *Gaudin*, 515 U.S. at 514, and makes a mockery of his solemn oath. But "to remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict." *United States v. Thomas*, 116 F.3d 606, 621 (2d Cir. 1997). And the distinction between these two kinds of jurors is "often difficult." *Id.*

To guard against "the danger that a dissenting juror might be excused under the mistaken view that the juror is engaging in impermissible nullification," we have established "a tough legal standard" for the dismissal of jurors during deliberations. *Abbell*, 271 F.3d at 1302. Along with four of our sister circuits, we have held that, "[i]n these kind[s] of circumstances, a juror should be excused only when no 'substantial possibility' exists that she is basing her decision on the sufficiency of the evidence." *Id.* (citing *Thomas*, 116 F.3d at 621–22; *United States*

57

*v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987)); *accord United States v. Kemp*, 500 F.3d 257, 304 (3d Cir. 2007); *United States v. Symington*, 195 F.3d 1080, 1087 & n.5 (9th Cir. 1999). And we have explained that "[w]e mean for this standard to be basically a 'beyond reasonable doubt' standard." *Abbell*, 271 F.3d at 1302.

This point bears emphasis because it is easy to miss in the majority opinion: Under *Abbell*, the standard of proof that must be satisfied to dismiss a juror for refusal to apply the law to the evidence is "basically," *id.*, identical with the standard that assures "every individual going about his ordinary affairs . . . that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty." *In re Winship*, 397 U.S. 358, 364 (1970); *see also Kemp*, 500 F.3d at 304 (observing that the standard "corresponds with the burden for establishing guilt in a criminal trial"). "[A] lower evidentiary standard could lead to the removal of jurors on the basis of their view of the sufficiency of the prosecution's evidence," *Thomas*, 116 F.3d at 622, rendering a defendant's right to an uncoerced and unanimous jury verdict "illusory," *Brown*, 823 F.2d at 596. "The courts must in all cases guard against the removal of a juror—who aims to follow the court's instructions—based on his view on the merits of a case." *Thomas*, 116 F.3d at 622 n.11.

In Brown's trial, the district court instructed the jurors that "'[p]roof beyond a reasonable doubt' is proof so convincing that you would be willing to rely and

58

act on it without hesitation in the most important of your own affairs." This instruction "correctly conveyed the concept of reasonable doubt to the jury." *Holland v. United States*, 348 U.S. 121, 140 (1954). The Supreme Court has "repeatedly approved" jury instructions that define a reasonable doubt as "a doubt that would cause a reasonable person to hesitate to act." *Victor v. Nebraska*, 511 U.S. 1, 20 (1994); *see also Holland*, 348 U.S. at 140; *Hopt v. Utah*, 120 U.S. 430, 441 (1887) (holding that an instruction "refer[ring] to the conviction upon which the jurors would act in the weighty and important concerns of life[] would be likely to aid them to a right conclusion"). The Court has also approved the instruction "that if [the jurors can] reconcile the evidence with *any reasonable hypothesis* consistent with the defendant's innocence they should do so, and in that case find him not guilty." *Hopt*, 120 U.S. at 441 (emphasis added). "The evidence must satisfy the judgment of the jurors . . . so as to exclude any other reasonable conclusion." *Id.* If the evidence did not establish beyond a reasonable doubt that Juror No. 13 could not base his decision on the law and the evidence, then the district court erred when it dismissed him.

Our precedents and the persuasive authority we invoked in *Abbell* are instructive, although the majority grapples with none of them. In each of our decisions approving the dismissal of a dissenting juror, the district court received unambiguous information from the juror herself about her unwillingness or

59

inability to follow the law, *see United States v. Geffrard*, 87 F.3d 448, 451, 453–54 (11th Cir. 1996); credible complaints of misconduct corroborated by all of the other jurors, *see United States v. Godwin*, 765 F.3d 1306, 1315 (11th Cir. 2014); *Abbell*, 271 F.3d at 1303–04 & n.18; or a combination of both, *see United States v. Oscar*, 877 F.3d 1270, 1285–86 (11th Cir. 2017); *United States v. Augustin*, 661 F.3d 1105, 1129–32 (11th Cir. 2011). Our sister circuits have disapproved the dismissal of jurors even where substantial evidence supported the conclusion that the dismissed jurors were basing their decisions on disagreement with the law because the jurors referred to the evidence in explaining their positions. *See Brown*, 823 F.2d at 594, 596–97 (among other remarks, juror said that he "would have not said [he] could be impartial" if he "had known at the beginning . . . what the act said" but also that "[i]f the evidence was presented in a fashion in which the law is written, then, maybe, I would be able to discharge my duties"); *Thomas*, 116 F.3d at 611, 623–24 (among other problems, at least five jurors reported that the suspect juror had invoked legally irrelevant reasons for favoring acquittal, but several jurors reported that the suspect juror "couch[ed] his position in terms of the evidence"). And we expressly adopted *Brown* and *Thomas*'s standard in *Abbell*. *See* 271 F.3d at 1302–03 & nn.14, 17.

The majority pays little attention to our precedent and this heightened standard of proof. Instead, it stresses that "the district court understood the

60

governing law," Majority Op. at 28, before focusing on the discretion bestowed on district courts when deciding whether to dismiss a juror after deliberations begin. To be sure, the district court identified the correct legal standard, but identifying the correct standard and applying that standard correctly are two different matters. And the district court failed to apply our standard correctly.

As the majority points out, we do not stand in this appeal as factfinders in the first instance. "The decision to excuse a juror for cause . . . is within the sound discretion of the trial judge." *United States v. Taylor*, 554 F.2d 200, 202 (5th Cir. 1977). "We will reverse the district court only if we find that it discharged the juror 'without factual support, or for a legally irrelevant reason.'" *Abbell*, 271 F.3d at 1302 (alteration omitted) (quoting *United States v. Register*, 182 F.3d 820, 839 (11th Cir. 1999)). The district court "determine[d] as a matter of fact that no substantial possibility exist[ed]" that Juror No. 13 was basing his decision on the law and the evidence, and we "review that finding only for clear error." *Id.* at 1303. "A finding is 'clearly erroneous' when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). This standard of review is deferential, but it is not reverential.

61

"And, importantly, in applying the clearly erroneous standard, a reviewing court must take account of the standard of proof informing the trial court's factual finding." Harry T. Edwards & Linda A. Elliott, *Federal Standards of Review* 26 (3d ed. 2018). The Supreme Court has clarified that the "mistake" that requires reversal for clear error is "a mistake in concluding that a fact [was] proven under the applicable standard of proof," not necessarily a mistake about the ultimate fact itself. *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622–23 (1993). So, to reverse the denial of Brown's motion for a new trial, we need not have the definite and firm conviction that Juror No. 13 was following the law—although, obviously, we should reverse if we do. Instead, we are bound to reverse if, on the entire evidence, we are firmly convinced that the proof of Juror No. 13's misconduct was not, as the district court aptly put it, "so convincing that [we] would be willing to rely and act on it without hesitation in the most important of [our] own affairs." I am so convinced. Here's why.

## B. *The Limited Information Before the District Court Clearly Did Not Exclude a Reasonable Doubt.*

Our precedent requires us to evaluate whether a substantial possibility existed that Juror No. 13 could base his decision on the evidence. And when a juror speaks "in terms of the evidence" in explaining his position, "we cannot say that it is beyond doubt that [the juror's] position during deliberations was the result of his defiant unwillingness to apply the law, as opposed to his reservations about the

62

sufficiency of the Government's case." *Thomas*, 116 F.3d at 624; *accord Brown*, 823 F.2d at 597. The record establishes that Juror No. 13 repeatedly referenced the evidence in explaining his deliberative process, but the majority ignores those references and repeatedly misrepresents Juror No. 13's position as being "irrespective of the evidence." *See, e.g.*, Majority Op. at 2–4, 27, 31–33, 38, 43.

On the evening of the second day of jury deliberations, Juror No. 8 expressed a concern to the courtroom deputy about another juror who was "talking about 'higher beings.'" As the district court later recounted, Juror No. 8 "said that she was calling on her own behalf, but thought that other jurors were concerned as well." The deputy stopped her, told her that she should not discuss the deliberations, but promised to bring the matter to the district court's attention.

The next morning, the district court conferred with the parties about how to proceed. At first, the district court was hesitant to interview any juror. It observed that the jury had "been diligent, that the deliberations ha[d] been progressing smoothly," with "no indication of problems in their deliberations, which distinguishe[d] [the situation] quite a bit from" our precedents involving juror misconduct. It pointed out that in "all of those cases, really, there was much more information that the court had" and "much more tangible evidence of a real problem in the deliberations." But, at the parties' insistence, the district court "reluctantly" agreed to interview Juror No. 8.

63

The district court told Juror No. 8 that she should not reveal her own or any other juror's opinions or deliberations but asked her to explain her "concerns" "in [her] own words." Juror No. 8 clarified that "[i]t was just the one concern," identified Juror No. 13 as the subject of her concern, and offered the district court a letter she had written in case she did not have a chance to call the deputy. The district court and the parties examined the letter, which read as follows:

Your Honor

With all due respect, I'm a little concerned about a statement made by Juror #13 when we began deliberation. He said "A Higher Being told me Corrine Brown was Not Guilty on all charges". He later went on to say he "trusted the Holy Ghost". We all asked that he base his verdict on the evidence provided, the testimony of the witnesses and the laws of the United States court. Other members of the Jury share my concern.

Thank You,

[Name Redacted], Juror #8

Juror No. 8 confirmed that the letter expressed "the sum and substance" of her concern; as she put it, she "was just concerned about those comments." While the letter circulated among counsel, the district court asked Juror No. 8 when Juror No. 13 had made the comments. She said that the "[t]he first one was when we first went into deliberation," "[a]nd the second one, shortly after, maybe within a few hours after." Later, she repeated the same timeline.

Through a series of questions, the district court tried to determine the effect of the comments on the jury's deliberations:

64

THE COURT: Has this juror expressed that view again?

JUROR [No. 8]: No, sir.

THE COURT: To your observation, has that juror been deliberating?

JUROR [No. 8]: Yes.

THE COURT: Is there anything about the situation as it stands right now that's interfering with your ability to deliberate in the way that the court has directed in the instructions?

JUROR [No. 8]: No, sir. Not at all. I was more concerned that it was going to interfere in his ability to do that.

. . .

THE COURT: . . . [H]as this juror repeated that comment or anything similar to that since then?

JUROR [No. 8]: No, sir, but other jurors have.

THE COURT: I don't know what you mean by that.

JUROR [No. 8]: Some of the jurors are concerned that that's affecting his—his decision.

The district court paused to ask if the parties thought it should ask anything else. After taking suggestions from Brown's counsel, it asked whether Juror No. 8 had decided to call the deputy on her own. She confirmed she had, adding that she did not "think any of [the other jurors were] even aware that" she had done so. And, when the district court asked her to clarify whether the other jurors had expressed their concerns during or outside of deliberations, she said "[i]t was all in—during deliberations . . . [w]ith [Juror No. 13] present."

The interview, which ended there, produced limited information about Juror No. 13's possible misconduct. Although Juror No. 8 voiced general expressions of

65

"concern" about Juror No. 13's comments, she did not say that Juror No. 13 was ignoring the law or the evidence, refusing to deliberate, or obstructing the jury's deliberation in any way. On the contrary, she said—without qualification and contrary to the majority's description, Majority Op. at 24–25, 34—that Juror No. 13 *was* deliberating, and she confirmed that nothing was "interfering with [her] ability to deliberate." Although she then clarified that she "was more concerned that it was going to interfere in [Juror No. 13's] ability to do that," she did not opine that anything *was* interfering with his deliberations. Indeed, she strongly suggested that her concern was based *solely* on the initial comments from the first day ("I was just concerned about those comments"), not on any concrete problems that had arisen since then regarding Juror No. 13's willingness or ability to deliberate about the evidence. And the district court did not inquire into the context of Juror No. 13's statements or how he had responded to the other jurors' expressions of concern. After the interview of Juror No. 8, the government suggested that the district court "inquire with the foreperson in camera to ask if [Juror No. 8's] view [was] shared by the foreperson or any of the other jurors," while Brown's counsel thought the district court could stop his investigation. Instead, the district court decided to interview Juror No. 13. Although the parties did not favor that course, they agreed that the interview should "go from general to more specific."

66

The district court's first interview with Juror No. 13 certainly failed to bring compelling proof of misconduct to light. Indeed, in describing his deliberative process, Juror No. 13 spoke in terms of the evidence presented. The district court asked him whether he was "having any difficulties with any religious or moral beliefs . . . interfering with [his] ability to decide the case on the facts presented and on the law as [instructed]." He replied, "No, sir." The district court asked him whether he "consider[ed] [him]self to have been deliberating with [the] other jurors according to the law [as instructed]." His initial response—"We have been going over all the individual numbers, as far as . . ."—appeared to be so specific about the content of deliberations that the district court felt obliged to cut him off. When the district court clarified that it wanted only a general answer, Juror No. 13 said, "I've been following and listening to what has been presented and making a determination from that, as to what I think and believe." Those words were his own, and they did not track the language of any question he had been asked up to that point.

The district court told Juror No. 13 that it was going to "get a little more specific with [him]." It did so:

> THE COURT: Okay. That's fine. So let me get a little more specific with you. Have you expressed to any of your fellow jurors any religious sentiment, to the effect that a higher being is telling you how—is guiding you on these—on these decisions, or that you are trusting in your religion to—to base your decisions on? Have you made any—can

67

you think of any kind of statements that you may have made to any of your fellow jurors along those lines?

JUROR [No. 13]: I did, yes.

THE COURT: Okay. Can you tell me, as best you can, what you said?

JUROR [No. 13]: Absolutely. I told them that in all of this, in listening to all the information, taking it all down, I listen for the truth, and I know the truth when the truth is spoken. So I expressed that to them, and how I came to that conclusion.

THE COURT: Okay. And in doing so, have you invoked a higher power or a higher being? I mean, have you used those terms to them in expressing yourself?

JUROR [No. 13]: Absolutely. I told—I told them that—that I prayed about this, I have looked at the information, and that I received information as to what I was told to do in relation to what I heard here today—or this past two weeks.

THE COURT: Sure. When you say you received information, from what source? I mean, are you saying you received information from—

JUROR [No. 13]: My Father in Heaven.

THE COURT: Okay. Is it a fair statement—I don't want to put words in your mouth. But are you saying that you have prayed about this and that you have received guidance from the Father in Heaven about how you should proceed?

JUROR [No. 13]: Since we've been here, sir.

Let's pause to examine this exchange. The district court broke off its first question several times, unsure exactly what it wanted to ask Juror No. 13. Was it that "a higher being [was] telling [him] how" to decide the case? That a higher being was "guiding [him] . . . on these decisions"? Or was it "that [he was] trusting in [his] religion . . . to base [his] decisions on"? The district court did not make

68

clear what differences of meaning, if any, these various tentative formulations were meant to convey. Nor did it make clear which of them it was sticking with when at last it asked Juror No. 13, capaciously, whether he had made "any kind of statements . . . along those lines."

To this ambiguous question, Juror No. 13 replied in the affirmative. When asked what he had said, he said he had explained to the other jurors his thought processes ("how I came to [my] conclusion") in determining what parts of the evidence he believed were credible ("listen[ing] for the truth," "know[ing] the truth when the truth is spoken") after having paid attention to the evidence presented at trial ("listening to all the information, taking it all down"). And, when asked specifically whether he had referred to "a higher power or a higher being," Juror No. 13 said he had told the other jurors "that [he] prayed about this, [he] ha[d] looked at the information, and that [he] received information as to what [he] was told to do in relation to what [he] heard here . . . this past two weeks." In other words, he used his own language to describe precisely the traditional role of a juror—to listen to the evidence adduced at trial, find the required facts, apply the law to those facts, and render a verdict based on those facts, *see Gaudin*, 515 U.S. at 514–15. To say that Juror No. 13 made his decision "irrespective of the evidence" is to ignore what Juror No. 13 said about both his decision and the evidence. *See* Majority Op. at 2–4, 27, 31–33, 38, 43.

69

At several points in its brief, the government echoes and emphasizes the words "received information" to suggest that this answer established or at least strongly suggested misconduct. Evidently persuaded by the government's repetition, the majority likewise stresses these words. *See* Majority Op. at 31–33. But reading the answer as a whole and in context, I disagree.

Just before the supposedly damning words "received information," Juror No. 13 stated that he had told his fellow jurors that he "ha[d] looked at the information." In the light of his previous answer, in which he also used the word "information" to refer to the evidence presented at trial and his evaluation of the evidence, that part of the sentence was clearly another reference to the evidence and what he thought of it. And in the latter part of the sentence, just *after* the supposedly damning words, Juror No. 13 said "that [he] received information as to what [he] was told to do *in relation to what* [*he*] *heard here*"—that is, in the courtroom—"*this past two weeks*"—that is, during the trial (emphasis added). Of course, what Juror No. 13 had heard in the courtroom over the course of the trial was the evidence, so the "information" he "received" was "in relation to" the evidence.

It is hard to see how the words "received information," sandwiched between two references to Juror No. 13's consideration and evaluation of the evidence, prove beyond a reasonable doubt his inability to base his decision on the evidence.

70

Indeed, the majority concedes that my reading "is certainly one *reasonable* construction." Majority Op. at 30–31 (emphasis added). That concession forecloses any argument that the district court correctly applied our "tough" standard of "beyond reasonable doubt." *Abbell*, 271 F.3d at 1302. Under that standard, if Juror No. 13's statements can be "reconcile[d] . . . with *any reasonable hypothesis consistent with*" proper jury service, then reasonable doubt existed, and the district court was required to accept that understanding. *Hopt*, 120 U.S. at 441 (emphasis added). And although Juror No. 13 couched the whole answer in extremely general terms—possibly because the district court had made clear that it did not want to hear details about the deliberations—"one reasonable construction," if not the most natural construction, from the answer as a whole is that Juror No. 13 had "prayed" for and received guidance in evaluating "the information" that he had "heard [in the courtroom]" over "th[e] past two weeks."

The district court too seems to have understood the answer in that way, contrary to the majority's belief. The majority contends that because it was the district court that first used the word "guidance," Juror No. 13 did not himself "characterize his religious inspiration as mere 'guidance.'" Majority Op. at 33. But when asking Juror No. 13 whether it was a "fair statement" to summarize his communication with God as him "receiv[ing] guidance," the district court was asking whether it had correctly understood Juror No. 13's representations of his

71

relationship with God. And Juror No. 13 assented to that description of his statement, adding, "[s]ince we've been here, sir." The district court did not follow up, at that time, with any more questions about either the content or the context of Juror No. 13's religious statements. The district court's summary shows that it understood Juror No. 13's statements as expressing the belief that he had received guidance in evaluating the evidence. So it does not matter that the district court first used that exact phrasing, as that phrasing was premised on the district court's understanding of what Juror No. 13 conveyed about his communication with God. And Juror No. 13 confirmed that the district court's understanding was correct.

The district court then pivoted to a series of questions about Juror No. 13's understanding of his duty as a juror and whether he believed he was fulfilling his obligations. In explaining how his religious beliefs informed his jury service, Juror No. 13 appeared to be a diligent juror:

> THE COURT: Do you view that in any way—as you know, when I instructed you . . . you had told [the court] that you had no religious or any—you did not have any religious or moral beliefs that would preclude you from serving as a fair and impartial juror, nor did you have any religious or moral beliefs that would preclude you from sitting in judgment of another person. So you told [the court] that. And then you also—of course, you heard my instruction, where you have to base your decision only on the evidence presented during the trial and follow the law as I explained it. Do you feel that you have been doing that?
>
> JUROR [No. 13]: Yes, sir, I do.
>
> THE COURT: Do you feel that there is any inconsistency in the prayer that you've had or the guidance you're receiving and your duty to base your decision on the evidence and the law?

72

JUROR [No. 13]: You said a few—you said a few things. Repeat, please.

THE COURT: Do you feel that there's any religious tension, or is your religion and your obvious sincere religious beliefs—do you believe it at all to be interfering with or impeding your ability to base your decision solely on the evidence in the case and following the law that I've explained to you?

JUROR [No. 13]: No, sir. I followed all the things that you presented. My religious beliefs are going by the testimonies of people given here, which I believe that's what we're supposed to do, and then render a decision on those testimonies, and the evidence presented in the room.

After this exchange, the district court asked Juror No. 13 to retire to the jury room for a moment.

I think it plain that Juror No. 13's statements up to this point established more than "a tangible possibility, not just a speculative hope," that he was behaving properly. *Abbell*, 271 F.3d at 1302 n.14. Juror No. 8 had provided, at most, ambiguous information about Juror No. 13's ability to deliberate and base his verdict on the evidence, and Juror No. 13 unambiguously denied that his religious beliefs prevented him from doing so. On the contrary, he repeatedly and specifically affirmed—both in his own words and in the district court's—that he was basing his decision on the evidence. He explained that he had "been following and listening to what ha[d] been presented and making a determination from that"; that he had been "listening to all the information, taking it all down"; and that he was "look[ing] at the information."

73

Juror No. 13's most significant statement was this one: "My religious beliefs are going by the testimonies of people given here, which I believe that's what we're supposed to do, and then render a decision on those testimonies, and the evidence presented in the room." With this statement, Juror No. 13 drew *a direct and specific connection* between his self-understood religious duty and his—correctly described—legal duty as a juror to base his decision on the evidence. "[W]e cannot say with any conviction that" Juror No. 13's evaluation of Brown's guilt "stemmed from something *other* than" his view of the evidence, and "[g]iven th[at] possibility . . . we must find that his dismissal violated [Brown's] right to a unanimous jury verdict." *Brown*, 823 F.2d at 597; *accord Abbell*, 271 F.3d at 1302–03 & nn.14, 17; *Thomas*, 116 F.3d at 611, 623–24.

Provided the juror is telling the truth, it is hard to imagine what kind of evidence could prove more convincingly that a deeply religious juror should *not* be dismissed. After all, the original and traditional purpose of the juror's oath, as of all official oaths, is "to superadd a religious sanction to what would otherwise be his official duty, and to bind his conscience" against misuse of his office. *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 31 (1866) (David Dudley Field on the side of the petitioner). Unless Juror No. 13 was dissembling when he said that his "religious beliefs" required him to "go[] by the testimonies of people given here . . . and then render a decision on those testimonies, and the evidence presented in the

74

[court]room," the district court must have erred when he dismissed him. Even the majority acknowledges as much. Majority Op. at 40 ("There is certainly nothing wrong with jurors choosing to pray for wisdom and guidance in adjudging the evidence. But in our system, ultimately, jurors must root their verdicts in the evidence and the court's instructions on the law.").

Although the majority ignores it, the district court even made a finding that rules out the possibility that Juror No. 13 was dissembling. "Appellate courts reviewing a cold record give particular deference to credibility determinations of a fact-finder who had the opportunity to see live testimony," *Owens v. Wainwright*, 698 F.2d 1111, 1113 (11th Cir. 1983), including "the demeanor of the pertinent juror" in investigations of possible juror misconduct, *Abbell*, 271 F.3d at 1303. When the district court explained its decision to dismiss Juror No. 13 to the parties, it stressed that it found Juror No. 13 "very earnest" and "very sincere," that it was "sure" that Juror No. 13 "believe[d] that he [was] trying to follow the court's instructions," and that it was also "sure" that Juror No. 13 "believe[d] that he [was] rendering proper jury service." When the district court explained its decision to Juror No. 13, it told him, "I know you worked hard. I know you were sincere. . . . I'm sorry that it has to be this way." And, when the district court stood by its decision in denying Brown's motion for a new trial, it reiterated that its "colloquy with Juror No. 13 revealed him to be sincere and earnest."

75

The district court stated, and the majority stresses, that Juror No. 13 appeared "hesitant at first to explain . . . how his religious views ha[d] come to the fore during deliberations." Majority Op. at 34–35 (alterations in original). But the district court never explained which of Juror No. 13's statements it was referencing when it made that remark, and it certainly never suggested that Juror No. 13 was dissembling. On the contrary, it thought Juror No. 13 "earnest[ly]" and "sincere[ly]" "believe[d] that he [was] rendering proper jury service." And it "recognize[d] . . . that we're not dealing with somebody who has specifically said they won't follow the law. In fact, Juror No. 13 has said he's trying to do that and is trying." But it found that Juror No. 13's belief that he had received divine guidance made it impossible for him to do so. In other words, the district court effectively found that Juror No. 13 was confused about what "proper jury service" meant.

The problem with the majority accepting that finding is twofold. First, it is clearly not supported beyond a reasonable doubt in the light of Juror No. 13's specific and repeated descriptions of what he thought he was doing: "following and listening to what has been presented," "making a determination from that," "going by the testimonies," "and then render[ing] a decision on those testimonies, and the evidence presented." If Juror No. 13 was confused about his duties as a juror, he had a strange way of showing it. Second—as I explain in detail in the next part—

76

the district court's belief that Juror No. 13 was confused rested on its *own* confusion about proper jury service: namely, its mistaken view that Juror No. 13's reliance on and statements about divine guidance were disqualifying. Indeed, *immediately* after its offhand and unexplained remark about Juror No. 13's "hesitan[ce]," the district court made clear that the juror's dismissal was based on the content of his statements: that "he [had] received information from a higher source" and "that the Holy Spirit told him that Ms. Brown was not guilty on all charges."

After the initial interview, the district court asked Juror No. 13 only a few more questions before deciding to dismiss him. The district court called him back into the courtroom for this short follow-up interview:

> THE COURT: If you could just have a seat again, sir. And I appreciate your patience with us. And I—I want you to understand I am not criticizing you or saying you did anything wrong. We're just trying to figure some things out here.
>
> So what I want to ask you is a fairly direct question, and that is this: Did you ever say to your fellow jurors or to a fellow juror during your—during the time that y'all worked together, when the 12 started, something to this effect, A higher being told me that Corrine Brown was not guilty on all charges? Did you say something like that? Did you say that or something like that to any of your fellow jurors?
>
> JUROR [No. 13]: When we were giving why we were—insight, as far as not guilty or whatever for the first charge, yes.
>
> THE COURT: Did you say the words, A higher being told me that Corrine Brown was not guilty on all charges?
>
> JUROR [No. 13]: No. I said the Holy Spirit told me that.

THE COURT: Okay. And you—and I don't want to get into your deliberations. But at what point in the deliberations was that? Was it at the beginning? Was it early in the deliberations? When was it?

JUROR [No. 13]: I mentioned it in the very beginning when we were on the first charge.

The district court did not ask Juror No. 13 about the second statement Juror No. 8 had ascribed to him—that he "trusted the Holy Ghost"—and Juror No. 13 said nothing more until after his dismissal. The district court paused to confer with the parties. In a sidebar conference, the government insisted that Juror No. 13's comments were disqualifying, but Brown's counsel urged the district court to ask the juror "if he[] [was] able to follow the court's instructions and ha[d] he been doing so." The district court observed that it had already asked that question and declined to ask anything else. It excused Juror No. 13 from the courtroom. After discussion and a short recess, the district court announced its decision.

If any reasonable doubt already existed, this follow-up interview certainly failed to lay it to rest. To start, it is unclear exactly what the follow-up interview established about the content of Juror No. 13's religious statements. The district court's first question was simultaneously leading and vague, asking only whether Juror No. 13 had said something "to th[e] effect" of the statement Juror No. 8 had reported. In his second question, the district court tried to ascertain Juror No. 13's exact words, but Juror No. 13 *denied* that he had used the exact words put to him. He clarified that he had said "the Holy Spirit," not "[a] higher being," and he left

78

unsaid whether the words of the question mirrored his exact language in other respects. To be sure, he had the opportunity to clarify any other significant differences, and he did not. But the district court had cut him off once before for starting to share too much about what had been said in the jury room, and it was clear that the district court was seeking direct yes-or-no answers. *Cf. U.S. Gypsum Co.*, 333 U.S. at 395–96 (discounting the significance of answers given to leading questions on clear-error review).

That said, in my view, it makes no difference whether Juror No. 13 did or did not say the exact words "the Holy Spirit told me that Corrine Brown was not guilty on all charges," so let's assume he did. On this record—in the light of Juror No. 13's repeated, specific, and *sincere* assurances that he was basing his decision on the evidence, just as his "religious beliefs" told him he was "supposed to do"; in the light of Juror No. 8's agreement that he was deliberating; and in the total absence of any proof confirming misconduct—that statement alone clearly did not establish beyond a reasonable doubt that he was unwilling or unable to perform his duties as a juror.

More important than any uncertainty about Juror No. 13's exact words is how little the district court knew about the *context* of his statement about the Holy Spirit. The majority contends that Juror No. 13, contrary to the district court's instructions, had irrevocably made up his mind before deliberations began, Majority

79

Op. at 24–25, 31–33, but the record proves nothing of the kind. True, Juror No. 13 said that he referred to the Holy Spirit "in the very beginning when [the jury was] on the first charge." But the district court knew nothing else about the way the jury was structuring its discussion, much less the immediate circumstances of Juror No. 13's statement. Without that necessary context, the district court could not draw any firm conclusions from the timing or circumstances of the statement, nor can we. And the majority's inference that Juror No. 13 was unwilling to reconsider his position clearly is not supported by the record beyond a reasonable doubt. If any proof of such intransigence on his part existed, the district court failed to elicit it. Not even Juror No. 8 opined that Juror No. 13 was disregarding the evidence or his fellow jurors' arguments. But she *did* say that he was deliberating, and she voiced no concerns about anything he had said on the second day.

If anything supports the majority's inference, it must be Juror No. 13's religious language itself; that is, the majority must think that a juror who expresses the belief that he has received divine guidance necessarily implies that he is unwilling to consider his fellow jurors' arguments with an open mind. So the majority's argument, at bottom, depends on a variant of the district court's misconception that the words "the Holy Spirit told me that Corrine Brown was not guilty on all charges" amounted to facially conclusive proof of misconduct.

80

That misconception, which the district court accepted at the insistence of the government, was its central error. Because this point is so important and because the majority embraces it, I explain it at length in the next part.

### C. Juror No. 13's Religious Statements Were Not Disqualifying.

What did Juror No. 13 mean when he said, "the Holy Spirit told me that Corrine Brown was not guilty on all charges"? The majority, like the district court before it, takes pains to distinguish a juror's acceptable prayers for guidance from the unacceptable thought process that it thinks Juror No. 13's comments revealed. Majority Op. at 3, 33–35, 40. Here's how the district court tried to slice it when it announced its decision:

> I want to be very clear that I am drawing a distinction between someone who's on a jury who is religious and who is praying for guidance or seeking inspiration, or whatever mode that person uses to try to come to a proper decision, from this situation, where the juror is actually saying that an outside force, that is, a higher being, a Holy Spirit, told him that Ms. Brown was not guilty on those charges. And I think that's just an expression that's a bridge too far, consistent with jury service as we know it.

And, in the same discussion, the district court asserted that Juror No. 13's statement fell on the wrong side of this critical distinction "by definition":

> [A] juror who makes that statement to other jurors and introduces that concept into the deliberations . . . is a juror that is injecting religious beliefs that are inconsistent with the instructions of the court, that this case be decided solely on the law as the court gave it to the jury and the evidence in the case. Because, *by definition*, it's not that the person is praying for guidance so that the person can be enlightened, it's that the higher being—or the Holy Spirit is directing or telling the person what

81

disposition of the charges should be made. And based upon my reading
of the case law in other cases where religious beliefs have caused a juror
to be struck, this statement by the juror . . . is a disqualifying statement
(emphasis added).

The majority similarly acknowledges that "there is certainly nothing wrong with jurors choosing to pray for wisdom and guidance in adjudging the evidence," but it faults Juror No. 13 for believing God *answered* his prayer by giving him the guidance he sought. Majority Op. at 40.

The district court's and majority's reactions to Juror No. 13's religious statements reflect three fundamental and related confusions. First, the district court erroneously equated the divine guidance Juror No. 13 believed he had received with "religious beliefs" that render a person unable to perform the duties of a juror. Second, the district court erroneously conflated divine guidance with reliance on "an outside force," and the majority necessarily adopts that conflation by affirming the dismissal of Juror No. 13. Third, the district court jumped to, and the majority now adopts, the unwarranted conclusion that Juror No. 13's comments "by definition" meant that he was not basing his decision on the evidence. I explain these errors in turn.

1.  The District Court Erroneously Equated a Belief in Divine Guidance with
Disqualifying Religious Beliefs.

The district court compared Juror No. 13 with the jurors "in other cases where religious beliefs have caused a juror to be struck," but the difference

82

between this appeal and those decisions is instructive. In *Geffrard*, for example, the dismissed juror sent the district court a lengthy, combative letter explaining that, "[b]ecause of [her] religious beliefs . . . in Swedenborgianism," she "could not live with a verdict of guilty for any of the accused on any of the charges, as [she] believe[d] deep within [her] heart and soul and mind that they were [entrapped]." 87 F.3d at 451, 453. She also made clear that her religious beliefs made it impossible for her to deliberate; in her words, "to discuss the teachings of Emanuel Swedenborg with the other jurors in relation to this case . . . would be like discussing the theory of relativity with my cocker spaniel dog." *Id.* at 453. In *Miles v. United States*, an appeal from a conviction for bigamy in the Utah Territory, the Supreme Court approved the exclusion of prospective jurors who "believed that polygamy was ordained of God, and that the practice of polygamy was obedience to the will of God." 103 U.S. 304, 310 (1880). And, in a recurring fact pattern, federal courts have excluded, removed, or allowed strikes of jurors who made clear that their religious belief that they must not judge others would conflict with jury service. *See, e.g.*, *United States v. Whitfield*, 590 F.3d 325, 360 (5th Cir. 2009); *United States v. Decoud*, 456 F.3d 996, 1003, 1005, 1016–17 (9th Cir. 2006); *United States v. Burrous*, 147 F.3d 111, 115, 117–18 (2d Cir. 1998); *United States v. Pappas*, 639 F.2d 1, 3–4 (1st Cir. 1980).

83

All of these decisions involved jurors whose religious beliefs—that is, specific propositions of moral and theological doctrine—threatened to make it impossible for them to return a verdict based on the application of the law to the evidence, no matter what facts they found. *See United States v. Stafford*, 136 F.3d 1109, 1114 (7th Cir. 1998) (explaining that a prospective juror may be struck based on "a belief that would prevent him from basing his decision on the evidence and instructions," like the belief "that crimes should be left entirely to the justice of God"). But Juror No. 13 said the opposite. Beyond his denials that he held any religious or moral beliefs that were interfering with his jury service, the record contains only one other statement by Juror No. 13 describing the content of his religious convictions: "My religious beliefs are going by the testimonies of people given here, which I believe that's what we're supposed to do, and then render a decision on those testimonies, and the evidence presented in the room." In other words, his "religious beliefs" required him to do his duty as a juror.

Instead of focusing on his "beliefs," any justification for Juror No. 13's dismissal must be based on the conviction that he had reached his not-guilty vote through an improper thought process. As everyone agrees, he was not subject to dismissal if he was praying for guidance in reaching a decision based on the law and the evidence. It should also be clear—and, if it is not, the next section will make it so—that he was not subject to dismissal just because he thought he had

84

*received* guidance in reaching a decision based on the law and the evidence. The district court was right to dismiss Juror No. 13 *only* if he was basing his decision on what he believed to be a private revelation from God that was *independent* of the law and the evidence, and only then if his misconduct was apparent beyond a reasonable doubt. By comparing Juror No. 13's situation with *Geffrard* and other decisions about disqualifying doctrinal commitments, the district court mistook the nature of the inquiry.

2.  The Majority Erroneously Affirms the District Court's Conflation of Divine Guidance with Outside Influence.

One persistent confusion that has plagued this appeal is the notion that a juror's belief that he has received divine guidance reflects a form of improper outside influence. The district court repeatedly described the guidance Juror No. 13 thought he had received as an "outside instruction," "instructions from an outside source," "an outside force," an "external force[]," and even an "outside opinion[]." And the majority reasons that Juror No. 13's decision was based on outside information—a "divine revelation"—instead of the evidence presented at trial. *See* Majority Op. at 3–4, 27, 31–34.

This confusion cannot withstand scrutiny. Indeed, it betrays a failure to reflect on the nature of prayer. Juror No. 13 sat through Brown's trial. By his account, he had "been following and listening to what ha[d] been presented" in evidence, "taking it all down," and "making a determination from that." Nothing

85

suggests that Juror No. 13 performed outside factual research or acquired any factual information outside of the evidence presented at trial. When he heard what he believed to be the Holy Spirit speaking to him in his mind and advising him what "determination" he was to make, what "external force" can be said to have influenced him? What exactly do the district court and the majority think was happening if not the operation of an internal thought process?

Juror No. 13's statement that God had communicated with him described an internal mental event, not an external instruction. The anthropologist T.M. Luhrmann, in an effort to describe the prayer life of American evangelicals in secular language, writes that, "[i]n effect, [believers] train the mind in such a way that they experience part of their mind as the presence of God. . . . They learn to identify some thoughts as God's voice, some images as God's suggestions, some sensations as God's touch or the response to his nearness." T.M. Luhrmann, *When God Talks Back: Understanding the American Evangelical Relationship with God* xxi (2012). But, ordinarily, they "still experience those thoughts and images and sensations . . . as if they were [their] own, generated from within [their] own mind and body." *Id.* at 41. When believers converse with God in prayer, both their addresses to him and his replies—if any—are "inner mental phenomena." *Id.* at 47.

Religious believers themselves commonly think of God's guidance less as "an outward voice" than as "an inward whisper, a deep speaking into the heart, an

86

interior knowing." Richard J. Foster, *Sanctuary of the Soul: Journey into Meditative Prayer* 11 (2011). From the religious point of view, Luhrmann's secular perspective is not inaccurate so much as merely incomplete, like the notions of the blind men feeling the elephant in Saxe's famous fable. *See* John Godfrey Saxe, *The Blind Men and the Elephant*, *in The Poems of John Godfrey Saxe* 259, 259–61 (Bos., James R. Osgood & Co. 1873) (telling of six blind men who each tried to describe an elephant after touching only one part of it and so provided six very different descriptions of the same animal).

What distinguishes the religious-spiritual understanding of prayer from the secular-psychological one is the premise that God is present, at least potentially, in the deepest recesses of the human heart and mind. Saint Augustine wrote, addressing God, "Thou wert more inward to me than my most inward part." St. Augustine, *The Confessions* III.VI.11, at 46 (J.G. Pilkington trans., Edinburgh, T. & T. Clark 1876). This assertion was no mere literary device. It expressed a metaphysical belief in God's immanence that is common to spiritual writers throughout time and across religious traditions. *See, e.g.*, *1 Corinthians* 3:16 (King James) ("Know ye not that ye are the temple of God, and that the Spirit of God dwelleth in you?"); Thomas Merton, *Zen and the Birds of Appetite* 24 (1968) ("The self is not its own center and does not orbit around itself; it is centered on God, the one center of all, which is 'everywhere and nowhere,' in whom all are

87

encountered, from whom all proceed."); Gershom Scholem, *On the Kabbalah and Its Symbolism* 94 (Ralph Manheim trans., Schocken Books 1996) (1960) (equating "the concept of the one God" in Jewish mysticism with "what is revealed in the fulness of man's inwardness"); Marmaduke Pickthall, *The Meaning of the Glorious Koran: An Explanatory Translation* 57:3, at 565 (1930) ("He is the First and the Last, and the Outward *and the Inward . . . .*" (emphasis added)); Swami Vivekananda, *The Absolute and Manifestation* (1896), *in* 2 *The Complete Works of Swami Vivekananda* 130, 141 (14th ed. 1958) ("He is the nearest of the near."); Martin Luther, *Exposition of the Fifty-First Psalm*, *in* 1 *Select Works of Martin Luther* 51, 153 (Henry Cole trans., London, W. Simpkin & R. Marshall 1826) ("The true Spirit, therefore, dwells in those who believe, not merely as to his gifts, but as to his substance."); *Selected Poems from the Dīvāni Shamsi Tabrīz* 73 (Reynold A. Nicholson ed. & trans., 4th ed. 2004) (1898) ("I gazed into my own heart; / There I saw Him; He was nowhere else."); *cf.* Hakuun Yasutani, *Yasutani-roshi's Introductory Lectures on Zen Training*, *in The Three Pillars of Zen* 3, 64 (Philip Kapleau ed., 35th anniv. ed. 2000) (1965) ("Just as [one is] never without [one's] head, so are we never separate from our essential Buddha-nature whether we are enlightened or not."). Through prayer, spiritual practitioners connect with the divine reality present within them. *See* William Law, *The Spirit of Prayer* 31 (AGES Dig. Lib. Collections 1997) (1749) ("For this turning to the Light and

Spirit of God within thee, is thy only true turning unto God, there is no other way of finding him, but in that place where he dwelleth in thee.").

One common goal of prayer is to attune the mind to receive God's internal guidance. *See, e.g.*, Thomas à Kempis, *The Imitation of Christ* 77 (Richard Challoner trans., TAN Books 2013) (c.1418) ("I WILL hear what the Lord God will speak in me. . . . Blessed is that soul which heareth the Lord speaking within her . . . . Blessed ears indeed, which hearken to truth itself teaching within . . . ."). After all, a basic tenet of theistic religion is that God assists those who rely on him in their difficulties, strengthening them in both intellectual and practical virtues. *See, e.g.*, *Psalm* 54:4 (King James) ("Behold, God is mine helper."); *Proverbs* 3:5–6 (King James) ("Trust in the LORD with all thine heart; and lean not unto thine own understanding. In all thy ways acknowledge him, and he shall direct thy paths."); *Ezekiel* 36:27 (King James) ("I will put my spirit within you, and cause you to walk in my statutes . . . ."). In the Christian tradition, the Holy Spirit is often, though not always, the divine person to whom such help is attributed. *See, e.g.*, *Romans* 8:9 (King James) ("[Y]e are not in the flesh, but in the Spirit, if so be that the Spirit of God dwell in you."); *Galatians* 5:22–23, 25 (King James) (identifying several virtues as "the fruit of the Spirit" and exhorting believers to "walk in the Spirit"); *Catechism of the Catholic Church* ¶ 1266, at 354 (Image Books 1995) ("The Most Holy Trinity gives the baptized . . . the power to live and

act under the prompting of the Holy Spirit through the gifts of the Holy Spirit . . . ."). Indeed, one of the biblical titles of the Holy Spirit, "paraclete," is sometimes translated "helper." *See* J.F. Sollier, *Paraclete*, 11 *The Catholic Encyclopedia* 469 (Charles G. Herbermann et al. eds., 1913); *see also id.* (discussing "the Holy Ghost's inhabitation in the soul of the just" and explaining that the soul "becomes the habitation of the three Persons of the Blessed Trinity" through the "indwelling of the Paraclete").

To understand that prayer is an internal process requires no special theological training. One of Luhrmann's evangelical acquaintances, a young woman named Hannah, described her prayer experiences this way: "I'm asking my unconscious—which is really the Holy Spirit—'What do you think about this idea?' And I recognize that it's not me, but God inside me, that I'm having a conversation with." Luhrmann, *When God Talks Back*, *supra* at 83. Although Saint Augustine might not have recognized the concept of the unconscious—a development of nineteenth- and twentieth-century psychology, *see* Sebastian Gardner, *The Unconscious Mind*, *in The Cambridge History of Philosophy 1870– 1945*, at 107, 107–09 (Thomas Baldwin ed., 2003)—the basic meaning of Hannah's account would have made perfect sense to him. And I suspect it would have made sense to Juror No. 13 too.

Jurors are "expected to speak, debate, argue, and make decisions the way ordinary people do in their daily lives." *Pena-Rodriguez*, 137 S. Ct. at 874 (Alito, J., dissenting). For religious believers, prayer and reliance on God can be inseparable from their everyday "way of thinking, speaking, and deciding." *Id.*; *see also State v. DeMille*, 756 P.2d 81, 84 (Utah 1988) ("Prayer is . . . certainly a part of the personal decision-making process of many people, a process that is employed when serving on a jury.").

American courts have rightly rejected arguments that it is inherently improper for jurors in a criminal trial to turn to prayer as part of their deliberations. *See, e.g.*, *State v. Williams*, 832 N.E.2d 783, 790 (Ohio Ct. App. 2005) ("[T]he mere fact that a jury or jurors have participated in prayer does not, absent evidence that the prayer rendered the juror or jurors incapable of making an unbiased decision, substantiate a due process violation."). Provided that they follow the court's instructions, jurors may pray for guidance alone, *see State v. Young*, 710 N.W.2d 272, 283 (Minn. 2006); in small groups, *see State v. Elliott*, 628 S.E.2d 735, 747–48 (N.C. 2006); or as a body, *see Commonwealth v. Tedford*, 960 A.2d 1, 38–40 (Pa. 2008). They may pray for God's guidance at the outset of deliberations, *see State v. Setzer*, 36 P.3d 829, 832 (Idaho Ct. App. 2001); they may seek it again day by day as deliberations continue, *see State v. Graham*, 422 So. 2d 123, 135–36 (La. 1982); and they may ask God to confirm their consciences once they have

reached a decision, *see Smith v. State*, 877 So. 2d 369, 383 (Miss. 2004). The Supreme Court of California, for example, found no error in "[t]he fact that some jurors expressed their religious beliefs or held hands and prayed during deliberations" in the sentencing phase of a capital trial; the court recognized the jurors' "need to reconcile the difficult decision—possibly sentencing a person to death—with their religious beliefs and personal views." *People v. Lewis*, 28 P.3d 34, 73 (Cal. 2001). And the Oklahoma Criminal Court of Appeals has eloquently explained why believers would find it natural to pray in the guilt phase too:

> The function of the jury was to ferret out from the evidence produced the truth of the matters then under study, as best they might. They had the instructions of the court as to the law of the case. But their great problem was in determining and evaluating the facts from what they had before them. There was need that their minds, their every faculty, should function at the highest efficiency. Surely a mind turned in humility and love toward the Creator would come nearer being freed from prejudice and function with greater deliberation than otherwise would be the case.

*Fields v. State*, 284 P.2d 442, 454 (Okla. Crim. App. 1955). To paraphrase the *Fields* court only slightly by using Juror No. 13's own words, religious jurors often pray for guidance "in listening to all the information, taking it all down, . . . listen[ing] for the truth, . . . know[ing] the truth when the truth is spoken," and "making a determination from that."

Of course, if religious jurors may pray for God's guidance, it follows that they must be entitled to *receive* God's guidance, or at least to *believe* that they

have received it. The majority faults Juror No. 13 for believing that he "received information from his Father in Heaven." Majority Op. at 30–31 (alterations and internal quotation marks omitted). But every prayer implies a hope that the prayer be answered. *See Matthew* 7:7 (King James) ("Ask, and it shall be given you; seek, and ye shall find; knock, and it shall be opened unto you."); *id.* 21:22 (King James) ("[A]ll things, whatsoever ye shall ask in prayer, believing, ye shall receive."). A prayer for guidance implies a hope that guidance will come. *See* Foster, *Sanctuary of the Soul*, *supra* at 20 (underlining "hearing and obeying" as important elements of prayer). And a religious juror who "solemnly swears," as Juror No. 13 did, to "render a true verdict, according to the law, evidence, and instructions of th[e] court, so help [me] God," must be entitled to believe that God truly helps him to fulfill his oath. Indeed, for religious believers, to invoke the name of God without meaning it would be immoral. *See Exodus* 20:7 (King James) (commanding "[t]hou shalt not take the name of the LORD thy God in vain"); *see also Catechism of the Catholic Church* ¶¶ 2149–2155, at 576–78 (explaining that false or lightly taken oaths violate the commandment); Wayne Gruden, *Systematic Theology* 387 (1994) ("[W]e cannot fool God.").

For a juror to receive and rely on divine guidance is not misconduct. When a conscientious juror asks God in prayer to assist her and believes that she has received his assistance, she has not taken instructions from an outside source. She

93

has not performed the supernatural equivalent of a Google search. She has not made the Omniscient her own private eye to dig up additional evidence for or against the defendant. All she has done is to seek clarity of mind, insight, and discernment from that interior place where her conscious mind makes contact with what she believes is the divine. As long as the object of her prayers is an honest attempt to discern the facts from the evidence and to apply the law to those facts, the prayerful meditations of such a juror are no less valid a form of deliberation than any other.

On the flip side, of course, a juror who refuses or is unable to apply the law to the evidence for a spiritual reason is no less subject to dismissal than a juror who does the same thing for a secular reason. When it is apparent beyond a reasonable doubt that "'religious inspiration' prevent[s] [a] juror from considering the evidence at all," *United States v. Salvador*, 740 F.2d 752, 755 (9th Cir. 1984), that juror may be dismissed, just like a juror who refuses to deliberate for any other reason. And when it is apparent beyond a reasonable doubt that a juror has "abandon[ed] his or her judgment [about the evidence] to what he or she perceives to be oracular signs," *DeMille*, 756 P.2d at 84, that juror may be dismissed, just like a juror who decides to base her vote on any other nonevidential event, like the weather or the outcome of a coin flip.

94

Indeed, as these examples suggest, the notion that religion poses a unique problem in the context of juror-misconduct investigations is unfounded. Whenever a juror's thought process is put in question, whether he expresses himself in religious language or in secular terms, the crux of the issue is the same: Is the juror making an honest attempt to determine the facts proved by the evidence and to apply the law to those facts? Or is he basing his decision on whim, bias, random chance, or some other arbitrary criterion? In the former case, the juror's promise not to rely on outside information does not bar him from appealing to his God for help. And, in the latter case, an arbitrary secular juror and an arbitrary religious juror are two peas in the same pod.

The majority, like the district court, acknowledges the propriety of a juror's prayers for guidance. Majority Op. at 40. But, like the district court, it thinks that something about Juror No. 13's statements crossed a line. I have explained that the problem cannot be that Juror No. 13 relied on "an outside source." I next explain that the facial content of Juror No. 13's statements did not prove an unacceptable thought process.

### 3. The Majority Errs By Adopting the District Court's Unwarranted Conclusion that Juror No. 13's Statements Were Unacceptable "By Definition."

The majority has erroneously latched on to the district court's determination that Juror No. 13's language—that is, his statement that "the Holy Spirit told [him]

that Corrine Brown was not guilty on all charges"—was facially conclusive proof that he was failing to discharge his duties. *See* Majority Op. at 31–35. The district court reasoned that, "by definition, [the statement is] not that the person is praying for guidance so that the person can be enlightened, it's that the higher being . . . or the Holy Spirit is directing or telling the person what disposition of the charges should be made." But Juror No. 13's statement did not prove "by definition" that his thought processes were improper.

The district court did not clarify exactly why it believed that Juror No. 13's comment reflected an improper thought process "by definition," but its reasoning suggests two possibilities. First, the district court may have found it troubling that the guidance Juror No. 13 thought he had received was dispositive, that is, it told him "what disposition of the charges should be made." Indeed, that possibility seems to be what troubles the majority the most. *See, e.g.*, Majority Op. at 33 ("Juror 13's self-worded responses to the court's open-ended questions consistently characterized the message he believed he received as a directive or conclusion."). But if jurors are entitled to think they have received divine guidance in weighing the evidence—and they are—they must also be entitled to think they have received *clear* guidance. There would be no sense in a rule limiting a juror's reliance on God to reliance only on his murkier signals, nor could courts draw any principled line to enforce such a rule. Of course, whatever guidance a juror thinks

96

he has received from God does not remove his duty to reach a decision based on the evidence after good-faith deliberations with his fellow jurors. The juror in *Salvador*, who *stopped deliberating* because he believed that God had given him the right answer, was in the wrong. *See* 740 F.2d at 754–55. But Juror No. 13 was deliberating, and he told the district court time and time again that he was basing his decision on the evidence. Provided that he was doing so, it makes no difference how clear he believed God's guidance had been.

Indeed, it would be ironic to fault Juror No. 13 for meaningfully relying on God's guidance when the district court itself invoked the assistance of God. Every juror in Brown's trial swore to faithfully fulfill their duties using an oath that ended with "so help you God." In framing the oath this way, the court adhered to an ancient tradition of ensuring honesty by invoking supernatural sanction on those who swear a false oath. *See* Thomas R. White, *Oaths in Judicial Proceedings and Their Effect Upon the Competency of Witnesses*, 51 Am. L. Reg. 373, 374–76 & n.3 (1903); *see also* 1 William Blackstone, *Commentaries* *369 (stating that oaths are a well-established practice that strengthened the social obligation of truth "by uniting it with that of *religion*"). Indeed, the phrase "[so] help me God" invokes "God's vengeance" when a juror does not "fulfil [his] engagement to speak the truth, or perform the specific duty." James E. Tyler, *Oaths; Their Origin, Nature, and History* 57 (London, John W. Parker 1884); *accord* White, *Oaths in Judicial*

97

*Proceedings*, *supra*, at 380 n.10 (stating that "So help me God" is shorthand for "So may God help me at the judgment day if I speak true, but if I speak false, then may He withdraw His help from me" (internal quotation marks omitted)); *Pierce v. Commonwealth*, 408 S.W.2d 187, 188 (Ky. 1966) (observing that "the use of the words 'So help me God' in the juror's oath" means that "the juror will, as God is his witness, decide the issues according to the evidence"). And "so help me God" remains a staple of jury oaths in federal courts today. *See* Fed. Judicial Ctr., *Benchbook for U.S. District Judges* § 7.08, at 269 (6th ed. 2013); *see also* 28 U.S.C. § 453 (requiring justices and judges to take an oath of office that includes "So help me God"). If courts can invoke God's damnation to ensure faithful juries, then surely individual jurors can rely on divine aid to avoid that fate.

Second, the district court and majority may have drawn an unfavorable inference about Juror No. 13's mental processes based on the vividness and directness of his religious language. Undoubtedly, even many devout religious believers would stumble over the words "the Holy Spirit told me . . ." or "I received information from my Father in Heaven." And even many people of faith are unused to hearing such expressions in the mouths of others.

But Juror No. 13's idiom was not sufficient proof of misconduct. After all, people talk about religion in different ways. And for many contemporary Americans, to call prayer a conversation with God is more than a metaphor. A

98

recent study by the Pew Research Center found that 74 percent of survey respondents said they try to talk to God or a higher power. Pew Research Ctr., *When Americans Say They Believe in God, What Do They Mean?* 27 (2018). And about a third as many—28 percent of respondents—said that God or a higher power *talks directly to them. Id.*; *see also id.* at 4 (noting that 80 percent of American adults believe in God, while an additional nine percent believe in some higher power or spiritual force).

The gap between those figures is illuminating. Most believers do not say that God talks to them directly. They believe that he affects their lives in other ways—for example, three in four American adults say that God has protected them, and nearly half believe that he "directly determines what happens in their lives all or most of the time," *id.* at 6, 28, 31—but their relationship with God, as they understand it, does not include direct personal communication from God to them, at least not of the kind they would call "talking." Yet a substantial fraction of American adults believes and is willing to say that God *does* talk to them directly. This is no fringe phenomenon. That 28 percent of American adults includes about one in four men, one in three women, one in four college graduates, one in three Republicans or Republican-leaners, and one in four Democrats or Democratic-leaners. *Id.* at 27.

Members of some religious groups are more likely than others to report two-way communication with God, underscoring that different people are used to thinking and talking about their prayer life in different ways. Sixty-three percent of Jewish Americans say that they talk to God, but only nine percent report that he talks back to them. *Id.* Large majorities of Catholics and mainline Protestants say that they talk to God, but only about a quarter say that God talks directly to them. *Id.* "Communicating with God is most common among evangelical Protestants and those in the historically black Protestant tradition, with nearly everyone in both groups saying they talk to God. Six-in-ten people in the historically black Protestant tradition say this communication is a two-way street," making them the only group with a majority saying so. *Id.* Among evangelicals, 45 percent of respondents said that God speaks to them directly. *Id.*

In our culturally and religiously diverse nation, such differences are not surprising. As Luhrmann observes, "[i]f the supernatural is real, it reaches to each according to that person's skills and style." Luhrmann, *When God Talks Back*, *supra* at 222. Another, more mundane explanation is that what Luhrmann calls different people's "social worlds"—the background assumptions embedded in their communities and ways of living—shape their expectations of and their ways of talking about religious experience. *Compare id.* at 219 ("There are social worlds in which the dead are known to be present and in which experts have direct,

100

unmediated access to the supernatural, and in those worlds, visions and voices are normative."), *with id.* at 319 ("Christians in . . . early-twenty-first century America . . . live in a world in which it is entirely possible to take for granted that talk of the supernatural is bunk. That is what is modern."), *and id.* at 322 ("Insoo Kim [an evangelical pastor] believes in his God. But he cannot escape his doubt. It is part of his social world."). And "[o]nly some religious communities encourage people to pay attention to their subjective states with the suggestion that God may speak back to them in prayer." *Id.* at xxiv. For obvious reasons, members of those communities are more likely to hold the conviction that God's voice may be no farther from them than their next thought.

Take Luhrmann's evangelicals. They practice a faith "in which God is thought to be present as a person in someone's everyday life, and in which God's supernatural power is thought to be immediately accessible by that person." *Id.* at xix. "These Christians speak as if God interacts with them like a friend. He speaks to them. He listens to them. He acts when they pray to him about little mundane things, because he cares." *Id.* Although "[t]his kind of Christianity [can] seem[] almost absurdly vivid to someone who grew up in a mainstream Protestant church"—or, for that matter, other traditions—it is as familiar to millions of Americans as water is to a fish. *Id.*

101

That large numbers of Americans believe they experience God's guidance in the form of direct personal communication should not and does not disqualify them from jury service. Juries are supposed to be "selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861; *see also Taylor v. Louisiana*, 419 U.S. 522, 530 (1975). Based on the Pew findings, the probability that a randomly selected group of 12 American adults will include at least one person who believes and is willing to say that God talks to him directly is slightly higher than 98 percent. In locales where the community is more religious than the national average, or where churches that stress the interior experience of God are especially prevalent, that likelihood that every jury includes at least one such person is even closer to a virtual certainty. My guess is that there are places in this Circuit where it would be easier to fill a jury with 12 people *all* of whom believe that God speaks to them directly than with 12 people none of whom does.

When a juror is suspected of misconduct based on his way of talking about prayer, *Abbell*'s admonition that "judges must be careful not to dismiss jurors too lightly" requires attention to two distinct dangers. 271 F.3d at 1302. The first is the danger that other jurors might have misinterpreted the suspect juror's remarks. Our nation's religious diversity carries the risk of misunderstanding between people of different worldviews and from different walks of life. *See, e.g.*, Jonathan Merritt,

102

*It's Getting Harder to Talk About God*, N.Y. Times (Oct. 13, 2018), https://www.
nytimes.com/2018/10/13/opinion/sunday/talk-god-sprituality-christian.html; Leah
Libresco, *When Does Praying in Public Make Others Uncomfortable?*,
FiveThirtyEight (Sept. 16, 2016, 11:03 AM), https://fivethirtyeight.com/features
/when-does-praying-in-public-make-others-uncomfortable/. That risk extends to
the jury room. Jurors who "treat God like a cozy confidant and call a near-tangible
Holy Spirit into their presence," Luhrmann, *When God Talks Back*, *supra* at 15,
may speak and deliberate in ways that their secular or more spiritually staid co-
jurors find hard to understand or downright weird. *Cf. id.* at 39 (describing how
congregants at one church in Chicago "talk about things God has 'said' to them
about very specific topics—where they should go to school and whether they
should volunteer in a day care—and newcomers are often confused by what they
mean").

The second risk is the danger that *judges* might misinterpret religious
language. After all, "the Federal Judiciary is hardly a cross-section of America."
*Obergefell v. Hodges*, 135 S. Ct. 2584, 2629 (2015) (Scalia, J., dissenting).
Although federal judges are diverse in many ways, we have a few important traits
in common as a class. Before we become lawyers, we spend longer than most
Americans in the mostly secular world of postsecondary education. *See generally*
George M. Marsden, *The Soul of the American University: From Protestant*

103

*Establishment to Established Nonbelief* (1994). Afterward, we spend our professional lives immersed in another secular culture—the culture of legal discourse—that often struggles to understand religious practice or to take religious perspectives seriously. *See generally* Stephen L. Carter, *The Culture of Disbelief: How American Law and Politics Trivialize Religious Devotion* (1993); Richard John Neuhaus, *The Naked Public Square: Religion and Democracy in America* (1984). And, thanks to our elite position, even the religious among us are likely to be more familiar with certain forms of religious experience and religious language than with others. *Cf.* Pew Research Center, *When Americans Say They Believe in God*, *supra* at 23, 27 (reporting that college graduates are less likely than others to say that they "believe in God as described in the Bible" or that God talks directly to them); *Obergefell*, 135 S. Ct. at 2629 (Scalia, J., dissenting) (observing the absence of "a single evangelical Christian" on the "select, patrician, highly unrepresentative panel of nine" that is the Supreme Court).

In short, there is good reason to worry that members of our credentialed judicial elite, even with the best intentions, may not be ideally equipped to infer at once the true nature of a juror's thought process from the face of his statements about prayer. And when our decisions bear directly on "[t]he jury trial right [that] protects [defendants] from being judged by a special class of trained professionals," we must take particular care lest our distance from "the language of

ordinary people" lead us to make inferences stronger than a juror's language warrants. *Pena-Rodriguez*, 137 S. Ct. at 874–75 (Alito, J., dissenting).

In Brown's trial, to all appearances, Juror No. 13's religious language did not cause a total breakdown of communication with his fellow jurors. According to Juror No. 8, Juror No. 13 used religious language twice near the start of deliberations, some other jurors were concerned, they asked him to make sure he was basing his decision on the evidence, he continued to deliberate, he did not use religious language again, and only one juror raised any concern with the district court. Juror No. 8 never said that Juror No. 13 was ignoring the evidence or refusing to apply the law. Her story, as we know it, has plenty of blanks.

One plausible version with the blanks filled in goes like this: Juror No. 13 prayed about the evidence and thought he received guidance that it was insufficient to convict Brown; he twice told his fellow jurors as much using religious language that seemed natural to him; he realized that his religious language was an obstacle to communicating with some of his fellow jurors, so he stopped using it; and he continued to discuss the evidence with them using secular language. All the same, one juror saw fit to bring her concern to the attention of the district court, her concern was enough to prompt the district court to investigate Juror No. 13's religious statements, and one of his statements was enough to persuade the district court that he should be dismissed.

105

But that statement was not enough to justify his dismissal. If the district court could "reconcile the evidence with *any reasonable hypothesis* consistent with" proper jury service, he could not dismiss Juror No. 13. *Hopt*, 120 U.S. at 441 (emphasis added). And for all that the district court knew, "the Holy Spirit told me that Corrine Brown was not guilty on all charges" was nothing more than Juror No. 13's way of saying in his own personal or cultural idiom that he had asked God to help him weigh the evidence and that he thought God was leading him strongly toward acquittal. He could very well have meant no more than what other religious believers would have expressed in less vivid and direct language: for example, "I've prayed about this, and I feel that I have to vote not guilty." *Cf. State v. Rios*, 314 S.W.3d 414, 419 (Mo. Ct. App. 2010) (relating one juror's statement to another juror "that she had prayed on it, and that as a result of her prayers, she was confident that God [was] leading her in the right direction"). Juror No. 13's statement did not establish "by definition" that he was basing his decision on a private revelation independent of the evidence. It provides little comfort that the majority insists it might in a different case uphold a judge's finding that a juror used "mere[] idioms" to "describe only prayer" under the deferential standard it applies today. Majority Op. at 38 (alteration adopted) (internal quotation marks omitted). The risk of misunderstanding an idiom underscores the importance of

106

reviewing the district court's decision to determine whether the fact of misconduct was proved beyond a reasonable doubt.

The district court erred when it inferred an improper thought process from the face of Juror No. 13's language—an error that the majority has now consecrated as law. Once we see through the district court's confused reasoning, we find ourselves where we have been all along: with slender proof of Juror No. 13's misconduct and ample reason to doubt.

### D. The Remaining Arguments in Support of the Dismissal Fail.

Besides the district court's primary reason for dismissing Juror No. 13—its mistaken view that his religious statements were disqualifying *per se*—the government and the district court's order denying Brown's motion for a new trial suggest, but do not develop, several other arguments in support of the dismissal. Without exception, these half-proffered rationales are irrelevant.

For example, in a footnote in its order denying a new trial, the district court suggested that the mere fact of Juror No. 8's concern was probative of misconduct. That footnote read, in full: "Juror No. 8 was concerned enough that she contacted the courtroom deputy by phone at night, and followed up with a letter. In both of those communications she mentioned that other jurors were concerned about Juror No. 13 as well." In the same order, the district court wrote that "[h]ad Juror No. 13 simply stated to his fellow jurors that he was praying for guidance during the

107

deliberations, that would not have been problematic (and I doubt Juror No. 8 would have brought it to the Court's attention)." Although the district court did not make this argument in so many words, the obvious implication of these remarks is that it considered *that* Juror No. 8 was concerned as evidence that she was *right* to be concerned.

That reasoning turns *Abbell*'s principles upside-down. One reason that "we must apply a tough legal standard" to the dismissal of deliberating jurors is the danger that a majority of jurors might "collectively agree that the one or two hold-outs—instead of honestly disagreeing about the merits—are actually refusing to apply the law" and might "request the court's intervention with regard to those one or two dissenting jurors." *Abbell*, 271 F.3d at 1302. Such situations need not arise from the jurors' bad faith. In many cases, the natural human tendency to frustration and misunderstanding when faced with intractable disagreement will be enough. In every case, the point of our "tough legal standard" is to ensure that the dismissal of a juror accused of misconduct cannot be based solely on the accusers' say-so. "Thus, judges must be careful not to dismiss jurors too lightly, even in the face of complaints from a majority of the jury." *Id.* Needless to say, it follows that they must take care not to dismiss jurors too lightly in the face of mild expressions of concern from a single juror.

108

Still less relevant is any weight that the district court may have given to Juror No. 8's statements "that other jurors were concerned about Juror No. 13 as well." None of those jurors raised any concern with the district court, and the district court did not seek out their perspectives to confirm if they were accurately described. True, Juror No. 8 wrote that other jurors joined her in "ask[ing] [Juror No. 13 to] base his verdict on the evidence," and she told the district court that others expressed concerns about Juror No. 13's religious statements in his presence during deliberations. But the district court elicited no information about either the content or the context of the other jurors' remarks. Nor did it learn anything about Juror No. 13's response to his fellow jurors' concerns. As far as we know, he may have allayed entirely the concerns of every juror who had raised an eyebrow at his initial comments, with the sole exception of Juror No. 8. After all, she stated that she had not discussed bringing her concern to the district court with any other juror. To draw the conclusion that more than one juror was seriously worried is to speculate on the basis of the vaguest hearsay. If judges must tread lightly "even in the face of complaints from a majority of the jury," *Abbell*, 271 F.3d at 1302, all the more must they be careful not to treat vague, secondhand reports of shared concern *as if* they were complaints from multiple jurors.

The most troubling red herring is the government's suggestion that Juror No. 13 must have been disregarding the evidence because he expressed the belief that

109

Brown was not guilty of all 24 charges. The government conveys this message through the following phrases sprinkled throughout its brief: "Juror No. 13 had stated . . . that he had been told by the Holy Spirit that Brown was not guilty of all 24 charged counts"; "[n]otwithstanding his acknowledgement that he had received information telling him the appropriate verdict as to each of the 24 charged counts, Juror No. 13 persisted that he was following the court's instructions . . . ."; "he had been told by the Holy Spirit . . . that Brown was not guilty of all 24 charged crimes"; "Juror No. 13's announcement at the outset of deliberations that Brown was not guilty of all 24 counts because the Holy Spirit had told him so"; Juror No. 13 was told to "find Brown not guilty on all 24 charges"; Juror No. 13 "received information *from the Holy Spirit directing him to vote 'not guilty' across-the-board*"; Juror No. 13 was told "specifically what result to reach as to each count in this case"; "he had pre-decided the case—all 24 counts." Although the government never explicitly spells it out in its brief, its repeated choice to emphasize the number of charges makes it hard to read the brief without receiving the impression that it intended to suggest that because Brown was charged with 24 counts, she *must* be guilty of at least some of them. Sure enough, at oral argument, the government suggested that the district court properly could have considered that Juror No. 13 said that Brown was "not guilty of all twenty-four counts" when it concluded that Juror No. 13 was indifferent to the evidence. *See* Oral Argument at

110

28:20–30:35 (Feb. 2, 2019) ("That too provides more support for the court's finding."). And there is some reason to think the district court may have done so. In its order denying a new trial, the district court stressed that "Juror No. 13 . . . announced to his fellow jurors when they began deliberating on the first charge that the Holy Spirit told him that Corrine Brown was not guilty 'on all charges.'" The district court did not explain why it quoted and underlined those three words.

In assessing the likelihood that a juror who favors acquittal is basing his decision on the evidence, courts plainly cannot consider the number of charges against the defendant any more than they can consider "the apparent strength of the government's case," *Brown*, 823 F.2d at 600. In every jury trial, whether the indictment charges one count or one hundred counts, "the ultimate conclusion of guilt or innocence" is "the jury's constitutional responsibility." *Gaudin*, 515 U.S. at 514. More to the point, it is each juror's prerogative—indeed, it is his duty—to withhold his assent to a guilty verdict on each, any, *or all* charges unless he is convinced that the government has proved those charges beyond a reasonable doubt. For a court to reason that a juror must be disregarding the law, the evidence, or both because he is unwilling to convict the defendant of *something*—or even to entertain such a thought as one factor among several in its assessment—would trespass intolerably on the factfinding authority of the jury, to say nothing of the presumption of innocence. *See* James B. Thayer, *The Origin and Scope of the*

111

*American Doctrine of Constitutional Law*, 7 Harv. L. Rev. 129, 150 (1893) ("The court must not, even negatively, undertake to pass upon the facts in jury cases."). Simply put, the government is not entitled to an inference that a defendant who has been charged with many crimes is likely guilty of one of them and that any juror who disagrees is likely a nullifier.

### E.  The Majority Blesses a New Tactic for Disqualifying Certain Demographics from Jury Service.

Before concluding, I highlight one practical implication of the majority's decision. By affirming the dismissal of Juror No. 13, the majority creates the opportunity for whole swathes of citizens to be perfunctorily excluded from the jury pool at the outset during voir dire, and in doing so, provides cover for a discriminating attorney to obfuscate his invidious motives. All a discriminator need do is ask the jury venire about the nature of their beliefs in and relationship with God and then cite the majority's opinion to show that the offending jurors—of whom undoubtedly will be disproportionately comprised of African Americans and evangelical Christians—should be struck.

During jury selection, the trial court, on its own or upon a party's request, can excuse for cause any juror whom it believes cannot follow the law and evaluate a case impartially. By affirming the dismissal of Juror No. 13, the majority provides a roadmap for using a juror's beliefs about the nature of prayer

112

and divine guidance to proffer a neutral explanation that, in fact, masks more invidious discrimination.

African Americans and evangelical Christians believe they communicate with God at disproportionately high rates. *See* Pew Research Center, *When Americans Say They Believe in God*, *supra* at 27 (reporting that 60 percent of historically black Protestants and 45 percent of evangelicals believe God talks directly to them); *A Religious Portrait of African Americans*, Pew Research Center (Jan. 30, 2009) (reporting that 59 percent of African Americans identify with a historically black Protestant church and 15 percent with an evangelical Protestant church), https://www.pewforum.org/2009/01/30/a-religious-portrait-of-african-americans. Of course, contrary to the Majority's contention, I do not suggest that either African Americans or evangelical Christians would be unable to base decisions on the evidence presented. *See* Majority Op. at 42. My concern is that the majority's decision allows a discriminating attorney to remove persons who are able to base their decision on the evidence but who believe God communicates with them.

Because more African Americans and evangelical Christians believe God communicates with them, these two demographics will likely bear the brunt of the majority's decision. An attorney can now easily target and eliminate many members of these groups with the simple expediency of asking a few questions to

113

each potential juror: (1) Does God speak to and provide divine guidance to you in your daily life? If so, (2) will you pray for his guidance in evaluating this case? If so, (3) do you expect God to answer? If so, (4) will you follow God's guidance? Those who faithfully answer "Yes" to these questions are now safely excusable under today's decision without further inquiry, and it will be difficult for a judge to prevent these groups from being struck at disproportionate rates when this Court has blessed such excusal even after trial concludes and the jury is deliberating.

In effect, the majority's decision requires a trial court to remove those jurors *for cause* and so creates an end-run around the protections of *Batson v. Kentucky*, 476 U.S. 79 (1986). A discriminating attorney can ask questions of the venire that disproportionately impact certain demographics and then demand the trial court dismiss these jurors for cause in the name of *United States v. Brown*. And any member of the jury venire who speaks to and receives wisdom from God *will* be stricken on as little as the profession that she communicates with God and expects to communicate with God about the evidence at trial, even if she sincerely promises that she will follow the law and consider the evidence in evaluating the case.

We will be hard pressed to police these for-cause excusals on appeal because it is within the trial judge's discretion to excuse a potential juror for cause. *United States v. Flores*, 572 F.3d 1254, 1261 (11th Cir. 2009). And after today's decision

114

it would be an abuse of discretion for the trial court *not* to strike these potential jurors for cause. After all, the majority concludes that a juror's statement that he sought and received guidance from God establishes *beyond a reasonable doubt* that he is unfit to serve. *See* Majority Op. at 37 (explaining that based on the district court's findings, "excusing [Juror No. 13] was the only correct course of action"). In short, the majority's opinion creates more mischief than it manages and sets the groundwork to deprive many sincere, religious citizens of one of "the most substantial opportunit[ies]" they "have to participate in the democratic process." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2238 (2019).

\* \* \*

The majority's approval of Juror No. 13's dismissal cannot be reconciled with the rigorous legal standard we adopted in *Abbell*. I do not know what was happening in Juror No. 13's mind, much less his soul, in the two days preceding his dismissal. But I am firmly convinced that the district court did not know he engaged in an impermissible thought process either—not beyond a reasonable doubt.

Juror No. 13 repeatedly and specifically assured the district court that he was basing his decision on the evidence. He told the district court that his religious beliefs required him to do so. The district court did not think he was lying when he gave those assurances. And Juror No. 8 agreed that he was deliberating. That Juror

115

No. 13 spoke about his relationship with God in more vivid and direct terms than many of us hear in our day-to-day life did not prove beyond a reasonable doubt that he was unable to perform his duties. The record clearly discloses a substantial possibility that Juror No. 13 was basing his decision on his honest assessment of the evidence. That possibility entitles Brown to a new trial.

Not only does the majority's decision deny Brown her right to the unanimous and uncoerced verdict of an impartial jury of her peers, it also imperils that right for other defendants in this Circuit. It countenances discrimination against a substantial segment of the citizens in our Circuit who pray for and believe they receive divine guidance in their daily affairs. And it permits district courts to disqualify these ordinary people from jury service for nothing more than expressing that belief—even when there is good reason to think they are performing their duties.

I respectfully dissent.